BOLGER ET AL. *v.* YOUNGS DRUG PRODUCTS CORP.

No. 81–1590.   Argued January 12, 1983—Decided June 24, 1983

*David A. Strauss* argued the cause for appellants. With him on the briefs were *Solicitor General Lee* and *Deputy Solicitor General Geller.*

*Jerold S. Solovy* argued the cause for appellee. With him on the brief were *Robert L. Graham* and *Laura A. Kaster.* [*]

JUSTICE MARSHALL delivered the opinion of the Court.

Title 39 U. S. C. § 3001(e)(2) prohibits the mailing of unsolicited advertisements for contraceptives. The District Court held that, as applied to appellee's mailings, the statute violates the First Amendment. We affirm.

## I

Section 3001(e)(2) states that "[a]ny unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs . . . ." [1] As interpreted by Postal

---

[*]*Robert D. Joffe, Eve W. Paul,* and *Dara Klassel* filed a brief for the Planned Parenthood Federation of America, Inc., et al. as *amici curiae* urging affirmance.

*Michael L. Burack, Charles S. Sims,* and *Janet Benshoof* filed a brief for the American Civil Liberties Union as *amicus curiae.*

[1] Section 3001(e)(2) contains express limitations. In particular, an advertisement is not deemed unsolicited "if it is contained in a publication for which the addressee has paid or promised to pay a consideration or which he has otherwise indicated he desires to receive." In addition, the provision does not apply to advertisements mailed to certain recipients such as a manufacturer of contraceptives, a licensed physician, or a pharmacist. See §§ 3001(e)(2)(A) and (B).

Service regulations,[2] the statutory provision does not apply to unsolicited advertisements in which the mailer has no commercial interest. In addition to the civil consequences of a violation of § 3001(e)(2), 18 U. S. C. § 1461 makes it a crime knowingly to use the mails for anything declared by § 3001(e) to be nonmailable.[3]

Appellee Youngs Drug Products Corp. (Youngs) is engaged in the manufacture, sale, and distribution of contraceptives. Youngs markets its products primarily through sales to chain warehouses and wholesale distributors, who in turn sell contraceptives to retail pharmacists, who then sell those products to individual customers. Appellee publicizes the availability and desirability of its products by various methods. This litigation resulted from Youngs' decision to undertake a campaign of unsolicited mass mailings to members of the public. In conjunction with its wholesalers and retailers, Youngs seeks to mail to the public on an unsolicited basis three types of materials:

—multi-page, multi-item flyers promoting a large variety of products available at a drugstore, including prophylactics;

—flyers exclusively or substantially devoted to promoting prophylactics;

—informational pamphlets discussing the desirability and availability of prophylactics in general or Youngs' products in particular.[4]

---

[2] Domestic Mail Manual § 123.434 (July 7, 1981). The Manual, which is issued pursuant to the Postal Service's power to adopt regulations, 39 U. S. C. § 401, is incorporated by reference into 39 CFR pt. 111 (1982).

The Postal Service's interpretation of § 3001(e)(2) resulted from the decision in *Associated Students for Univ. of Cal. at Riverside* v. *Attorney General*, 368 F. Supp. 11 (CD Cal. 1973), in which a three-judge court held that the prohibition on the mailing of "advertisements" could not constitutionally be expanded beyond the commercial sense of the term, *id.*, at 24.

[3] The offense is punishable by a fine of not more than $5,000 or imprisonment for not more than 5 years, or both, for the first offense; and a fine of not more than $10,000 or imprisonment for not more than 10 years, or both, for each subsequent offense. 18 U. S. C. § 1461.

[4] In the District Court, Youngs offered two examples of informational pamphlets. See Record, Complaint, Group Exhibit C. The first, entitled

In 1979 the Postal Service traced to a wholesaler of Youngs' products an allegation of an unsolicited mailing of contraceptive advertisements. The Service warned the wholesaler that the mailing violated 39 U. S. C. § 3001(e)(2). Subsequently, Youngs contacted the Service and furnished it with copies of Youngs' three types of proposed mailings, stating its view that the statute could not constitutionally restrict the mailings. The Service rejected Youngs' legal argument and notified the company that the proposed mailings would violate § 3001(e)(2). Youngs then brought this action for declaratory and injunctive relief in the United States District Court for the District of Columbia. It claimed that the statute, as applied to its proposed mailings, violated the First Amendment and that Youngs and its wholesaler were refraining from distributing the advertisements because of the Service's warning.

The District Court determined that § 3001(e)(2), by its plain language, prohibited all three types of proposed mailings. The court then addressed the constitutionality of the statute as applied to these mailings. Finding all three types of materials to be commercial solicitations, the court considered the constitutionality of the statute within the framework established by this Court for analyzing restrictions imposed on commercial speech. The court concluded that the statutory prohibition was more extensive than necessary to the interests asserted by the Government, and

---

"Condoms and Human Sexuality," is a 12-page pamphlet describing the use, manufacture, desirability, and availability of condoms, and providing detailed descriptions of various Trojan-brand condoms manufactured by Youngs. The second, entitled "Plain Talk about Venereal Disease," is an eight-page pamphlet discussing at length the problem of venereal disease and the use and advantages of condoms in aiding the prevention of venereal disease. The only identification of Youngs or its products is at the bottom of the last page of the pamphlet, which states that the pamphlet has been contributed as a public service by Youngs, the distributor of Trojan-brand prophylactics.

it therefore held that the statute's absolute ban on the three types of mailings violated the First Amendment.[5]  526 F. Supp. 823 (1981).

Appellants brought this direct appeal pursuant to 28 U. S. C. § 1252, see *United States* v. *Darusmont*, 449 U. S. 292, 293 (1981), and we noted probable jurisdiction, 456 U. S. 970 (1982).

## II

Beginning with *Bigelow* v. *Virginia*, 421 U. S. 809 (1975), this Court extended the protection of the First Amendment to commercial speech.[6]  Nonetheless, our decisions have recognized "the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978).  Thus, we have held that the Constitution accords less protection to commercial speech than

---

[5] The District Court ordered that the multi-item drugstore flyers containing promotion of contraceptives could be mailed to the same extent such flyers could be mailed if they did not contain such promotion.  With respect to flyers and pamphlets devoted to promoting the desirability or availability of contraceptives, the court's order states that such materials were mailable only under four conditions:

"First, they must be mailed in an envelope that completely obscures from the sight of the addressee the contents.  Second, the envelope must contain a prominent notice stating in capital letters that the enclosed material has not been solicited in any way by the recipient.  Third, the envelope must contain a prominent warning that the contents are 'promotional material for contraceptive products.'  Fourth, the envelope must contain a notice, in less prominent lettering than the warning and the other notice, but not in 'fine print,' that federal law permits the recipient to have his name removed from the mailing list of the mailer of that envelope, and citing to 39 U. S. C. § 3008(a)."  526 F. Supp. 823, 830 (1981).

Youngs did not file a cross-appeal challenging these restrictions, and their propriety is therefore not before us in this case.

[6] Before that time, purely commercial advertising received no First Amendment protection.  See *Valentine* v. *Chrestensen*, 316 U. S. 52, 54 (1942).

to other constitutionally safeguarded forms of expression. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 562–563 (1980); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771–772, n. 24 (1976).

For example, as a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances.[7] See *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 538–539 (1980); Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U. Chi. L. Rev. 81, 82 (1978). By contrast, regulation of commercial speech based on content is less problematic. In light of the greater potential for deception or confusion in the context of certain advertising messages, see *In re R. M. J.*, 455 U. S. 191, 200 (1982), content-based restrictions on commercial speech may be permissible. See *Friedman* v. *Rogers*, 440 U. S. 1 (1979) (upholding prohibition on use of trade names by optometrists).

Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or noncommercial speech, we must first determine the proper classification of the mailings at issue here. Appellee contends that its proposed mailings constitute "fully protected" speech, so that § 3001(e)(2) amounts to an impermissible content-based re-

---

[7] Our decisions have displayed a greater willingness to permit content-based restrictions when the expression at issue fell within certain special and limited categories. See, *e. g.*, *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974) (libel); *Miller* v. *California*, 413 U. S. 15 (1973) (obscenity); *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572–573 (1942) (fighting words).

striction on such expression.[8]   Appellants argue,[9] and the District Court held,[10] that the proposed mailings are all commercial speech.   The application of § 3001(e)(2) to appellee's proposed mailings must be examined carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed.[11]

Most of appellee's mailings fall within the core notion of commercial speech—"speech which does 'no more than propose a commercial transaction.'" *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc., supra,* at 762, quoting *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 385 (1973).[12]   Youngs' informational pamphlets, however, cannot be characterized merely as proposals to engage in commercial transactions.   Their proper classification as commercial or noncommercial speech thus presents a closer question.   The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech.   See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 265–266 (1964).   Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech.[13]   See *Associated Students for Univ. of Cal. at Riverside* v. *Attorney General,*

---

[8] Brief for Appellee 17; see *id.,* at 12, 13, 15, 20, 25–31, 31–32.

[9] See Brief for Appellants 13–14, n. 6; Reply Brief for Appellants 1 ("We do not suggest that a prohibition comparable to Section 3001(e)(2) can be applied to fully protected, noncommercial speech").

[10] 526 F. Supp., at 826.

[11] Cf. *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 456 (1978).   To the extent any of appellee's mailings could be considered noncommercial speech, our conclusion that § 3001(e)(2) is unconstitutional as applied would be reinforced.

[12] For example, the drugstore flyer consists primarily of price and quantity information.

[13] One of the informational pamphlets, "Condoms and Human Sexuality," specifically refers to a number of Trojan-brand condoms manufactured by appellee and describes the advantages of each type.

The other informational pamphlet, "Plain Talk about Venereal Disease," repeatedly discusses condoms without any specific reference to those man-

368 F. Supp. 11, 24 (CD Cal. 1973). Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech. See *Bigelow* v. *Virginia*, 421 U. S., at 818; *Ginzburg* v. *United States*, 383 U. S. 463, 474 (1966); *Thornhill* v. *Alabama*, 310 U. S. 88 (1940).

The combination of *all* these characteristics, however, provides strong support for the District Court's conclusion that the informational pamphlets are properly characterized as commercial speech.[14] The mailings constitute commercial speech notwithstanding the fact that they contain discussions

---

ufactured by appellee. The only reference to appellee's products is contained at the very bottom of the last page, where appellee is identified as the distributor of Trojan-brand prophylactics. That a product is referred to generically does not, however, remove it from the realm of commercial speech. For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names. Or a trade association may make statements about a product without reference to specific brand names. See, *e. g.*, *National Comm'n on Egg Nutrition* v. *FTC*, 570 F. 2d 157 (CA7 1977) (enforcing in part a Federal Trade Commission order prohibiting false and misleading advertising by an egg industry trade association concerning the relationship between cholesterol, eggs, and heart disease). In this case, Youngs describes itself as "the leader in the manufacture and sale" of contraceptives. Brief for Appellee 3.

[14] See Note, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U. Chi. L. Rev. 205, 236 (1976). Of course, a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment. See *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943) (advertisement for religious book cannot be regulated as commercial speech); *Jamison* v. *Texas*, 318 U. S. 413 (1943). This case raises no such issues. Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial. For example, we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech. See Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, Sourcebook on Corporate Image and Corporate Advocacy Advertising, 95th Cong., 2d Sess., 1149–1337 (Comm. Print 1978) (FTC Memorandum concerning corporate image advertising).

of important public issues [15] such as venereal disease and family planning. We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 563, n. 5. A company has the full panoply of protections available to its direct comments on public issues, [16] so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. See *ibid.* Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues. Cf. *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 540 (1981) (BRENNAN, J., concurring in judgment).

We conclude, therefore, that all of the mailings in this case are entitled to the qualified but nonetheless substantial protection accorded to commercial speech.

## III

"The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 563. In *Central Hudson* we adopted a four-part analysis for assessing the validity of restrictions on commercial speech. First, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, "it at least must concern lawful activity and not be misleading." *Id.*, at 566. Second, we ask whether the governmental interest is

---

[15] Cf. *Time, Inc.* v. *Hill*, 385 U. S. 374, 388 (1967), quoting *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (1940) (defining public issues as those "about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period").

[16] See *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530 (1980).

substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest. *Ibid.* Applying this analysis, we conclude that § 3001(e)(2) is unconstitutional as applied to appellee's mailings.

We turn first to the protection afforded by the First Amendment. The State may deal effectively with false, deceptive, or misleading sales techniques. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S., at 771–772. The State may also prohibit commercial speech related to illegal behavior. *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 388. In this case, however, appellants have never claimed that Youngs' proposed mailings fall into any of these categories. To the contrary, advertising for contraceptives not only implicates "'substantial individual and societal interests'" in the free flow of commercial information, but also relates to activity which is protected from unwarranted state interference. See *Carey* v. *Population Services International,* 431 U. S. 678, 700–701 (1977), quoting *Virginia Pharmacy Board, supra,* at 760, 763–766.[17] Youngs' proposed commercial speech is therefore clearly protected by the First Amendment. Indeed, where—as in this case—a speaker desires to convey truthful information relevant to important social issues such as family planning and the prevention of venereal disease, we have previously found the First Amendment interest served by such speech paramount. See *Carey* v. *Population Services International, supra; Bigelow* v. *Virginia, supra.*[18]

---

[17] See also *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965).

[18] Appellants argue that § 3001(e)(2) does not interfere "significantly" with free speech because the statute applies only to unsolicited mailings and does not bar other channels of communication. See Brief for Appellants 16–24. However, this Court has previously declared that "one is not to have the exercise of his liberty of expression in appropriate places

We must next determine whether the Government's interest in prohibiting the mailing of unsolicited contraceptive advertisements is a substantial one. The prohibition in § 3001(e)(2) originated in 1873 as part of the Comstock Act, a criminal statute designed "for the suppression of Trade in and Circulation of obscene Literature and Articles of immoral Use." Act of Mar. 3, 1873, ch. 258, § 2, 17 Stat. 599.[19] Appellants do not purport to rely on justifications for the

abridged on the plea that it may be exercised in some other place." *Schneider* v. *State*, 308 U. S. 147, 163 (1939). See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 757, n. 15 (1976). Nor is the restriction on the use of the mails an insignificant one. See *Blount* v. *Rizzi*, 400 U. S. 410, 416 (1971), quoting *Milwaukee Social Democratic Publishing Co.* v. *Burleson*, 255 U. S. 407, 437 (1921) (Holmes, J., dissenting) ("The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . ."). The argument that individuals can still request that they be sent appellee's mailings, Brief for Appellants 19, does little to bolster appellants' position. See *Lamont* v. *Postmaster General*, 381 U. S. 301, 307 (1965) (Government's imposition of affirmative obligations on addressee to receive mail constitutes an abridgment of the addressee's First Amendment rights).

Of course, the availability of alternative means of communication is relevant to an analysis of "time, place, and manner" restrictions. See *Consolidated Edison Co.* v. *Public Service Comm'n of New York, supra*, at 541, n. 10; *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 93 (1977). Appellants do not, however, attempt to justify § 3001(e)(2) as a time, place, or manner restriction. Nor would such a characterization be tenable in light of § 3001(e)(2)'s content-based prohibition. See *Consolidated Edison Co.* v. *Public Service Comm'n of New York, supra*, at 536; *Linmark Associates, Inc.* v. *Willingboro, supra*, at 93–94; *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 209 (1975).

[19] The driving force behind § 3001(e)(2) was Anthony Comstock, who in his diary referred to the 1873 Act as "his law." See Paul, The Post Office and Non-Mailability of Obscenity: An Historical Note, 8 UCLA L. Rev. 44, 57 (1961). Comstock was a prominent antivice crusader who believed that "anything remotely touching upon sex was . . . obscene." H. Broun & M. Leech, Anthony Comstock 265 (1927). See *Poe* v. *Ullman*, 367 U. S. 497, 520, n. 10 (1961) (Douglas, J., dissenting). The original prohibition was recodified and reenacted on a number of occasions, but

statute offered during the 19th century.[20]   Instead, they advance interests that concededly were not asserted when the prohibition was enacted into law.[21]   This reliance is permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 460. Cf. *Doe* v. *Bolton*, 410 U. S. 179, 190–191 (1973) (a State may readjust its views and emphases in light of modern knowledge).

In particular, appellants assert that the statute (1) shields recipients of mail from materials that they are likely to find offensive and (2) aids parents' efforts to control the manner in which their children become informed about sensitive and important subjects such as birth control.[22]   The first of these interests carries little weight.   In striking down a state prohibition of contraceptive advertisements in *Carey* v. *Population Services International, supra,* we stated that offensiveness was "classically not [a] justificatio[n] validating the suppression of expression protected by the First Amendment.   At least where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression." 431 U. S., at 701.[23]   We specifically declined to recognize a dis-

---

its thrust remained the same—"to prevent the mails from being used to corrupt the public morals." S. Rep. No. 113, 84th Cong., 1st Sess., 1 (1955). In 1970 Congress amended the law by striking the blanket prohibitions on the mailing of all advertisements for contraceptives, but it retained without any real discussion the ban on unsolicited advertisements. See, *e. g.*, S. Rep. No. 91–1472, p. 2 (1970).

[20] The party seeking to uphold a restriction on commercial speech carries the burden of justifying it.   See *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 570 (1980); *Linmark Associates, Inc.* v. *Willingboro, supra*, at 95.

[21] See Brief for Appellants 24 ("Congress did not announce these interests in the legislative history when it enacted Section 3001(e)").

[22] See *id.*, at 24–33.

[23] See, *e. g.*, *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 915–920 (1982); *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419 (1971); *Cohen* v. *California*, 403 U. S. 15 (1971).

tinction between commercial and noncommercial speech that would render this interest a sufficient justification for a prohibition of commercial speech. *Id.*, at 701, n. 28.

Recognizing that their reliance on this interest is "problematic,"[24] appellants attempt to avoid the clear import of *Carey* by emphasizing that § 3001(e)(2) is aimed at the mailing of materials to the home. We have, of course, recognized the important interest in allowing addressees to give notice to a mailer that they wish no further mailings which, in their sole discretion, they believe to be erotically arousing or sexually provocative. See *Rowan* v. *Post Office Department*, 397 U. S. 728, 737 (1970) (upholding the constitutionality of 39 U. S. C. § 3008).[25] But we have never held that the Government itself can shut off the flow of mailings to protect those recipients who might potentially be offended. The First Amendment "does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech." *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S., at 542. Recipients of objectionable mailings, however, may "'effectively avoid further bombardment of their sensibilities simply by averting their eyes.'" *Ibid.*, quoting *Cohen* v. *California*, 403 U. S. 15, 21 (1971). Consequently, the "short, though regular, journey from mail box to trash can . . . is an acceptable burden, at least so far as the Constitution is concerned." *Lamont* v. *Commissioner of Motor Vehicles*, 269 F. Supp. 880, 883 (SDNY), summarily aff'd, 386 F. 2d 449 (CA2 1967), cert. denied, 391 U. S. 915 (1968).

---

[24] Brief for Appellants 30.

[25] Title 39 U. S. C. § 3008, a prohibition of "pandering advertisements," permits any householder to insulate himself from advertisements that offer for sale "matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." § 3008(a). The addressee's rights are absolute and "unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents—or indeed the text of the language touting the merchandise." *Rowan*, 397 U. S., at 737.

The second interest asserted by appellants—aiding parents' efforts to discuss birth control with their children—is undoubtedly substantial. "[P]arents have an important 'guiding role' to play in the upbringing of their children . . . which presumptively includes counseling them on important decisions." *H. L.* v. *Matheson,* 450 U. S. 398, 410 (1981), quoting *Bellotti* v. *Baird,* 443 U. S. 622, 637 (1979). As a *means* of effectuating this interest, however, § 3001(e)(2) fails to withstand scrutiny.

To begin with, § 3001(e)(2) provides only the most limited incremental support for the interest asserted. We can reasonably assume that parents already exercise substantial control over the disposition of mail once it enters their mailboxes. Under 39 U. S. C. § 3008, parents can also exercise control over information that flows into their mailboxes. And parents must already cope with the multitude of external stimuli that color their children's perception of sensitive subjects.[26] Under these circumstances, a ban on unsolicited advertisements serves only to assist those parents who desire to keep their children from confronting such mailings, who are otherwise unable to do so, and whose children have remained relatively free from such stimuli.

This marginal degree of protection is achieved by purging all mailboxes of unsolicited material that is entirely suitable for adults. We have previously made clear that a restriction of this scope is more extensive than the Constitution permits, for the government may not "reduce the adult population . . . to reading only what is fit for children." *Butler* v. *Michigan,*

---

[26] For example, many magazines contain advertisements for contraceptives. See M. Redford, G. Duncan, & D. Prager, The Condom: Increasing Utilization in the United States 145 (1974) (ads accepted in Family Health, Psychology Today, and Ladies' Home Journal in 1970). Section 3001(e)(2) itself permits the mailing of publications containing contraceptive advertisements to subscribers. Similarly, drugstores commonly display contraceptives. And minors taking a course in sex education will undoubtedly be exposed to the subject of contraception.

352 U. S. 380, 383 (1957).[27]  The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.  In *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978), this Court did recognize that the Government's interest in protecting the young justified special treatment of an afternoon broadcast heard by adults as well as children.[28]  At the same time, the majority "emphasize[d] the narrowness of our holding," *id.*, at 750, explaining that broadcasting is "*uniquely* pervasive" and that it is "*uniquely* accessible to children, even those too young to read." *Id.*, at 748–749 (emphasis added).  The receipt of mail is far less intrusive and uncontrollable.  Our decisions have recognized that the special interest of the Federal Government in regulation of the broadcast media[29] does not readily translate into a justification for regulation of other means of communication.  See *Consolidated Edison Co.* v. *Public Service Comm'n of New York, supra,* at 542–543; *FCC* v. *Pacifica Foundation, supra,* at 748 (broadcasting has received the most limited First Amendment protection).

Section 3001(e)(2) is also defective because it denies to parents truthful information bearing on their ability to discuss birth control and to make informed decisions in this area.[30]

---

[27] In *Butler* this Court declared unconstitutional a Michigan statute that banned reading materials inappropriate for children.  The legislation was deemed not "reasonably restricted" to the evil it sought to address; rather, the effect of the statute was "to burn the house to roast the pig."  352 U. S., at 383.

[28] See *New York* v. *Ferber*, 458 U. S. 747, 756–758 (1982).

[29] See *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 386–390 (1969).

[30] The statute also quite clearly denies information to minors, who are entitled to "a significant measure of First Amendment protection." *Erznoznik* v. *City of Jacksonville*, 422 U. S., at 212.  See *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969).  The right to privacy in matters affecting procreation also applies to minors, *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 72–75 (1976), so that the State could not ban the distribution of contraceptives to minors, see *Carey* v. *Population Services International*, 431 U. S. 678, 694 (1977) (plurality

See *Associated Students for Univ. of Cal. at Riverside* v. *Attorney General*, 368 F. Supp., at 21. Cf. *Carey* v. *Population Services International*, 431 U. S., at 708 (POWELL, J., concurring in part and concurring in judgment) (provision prohibiting parents from distributing contraceptives to children constitutes "direct interference with . . . parental guidance"). Because the proscribed information "may bear on one of the most important decisions" parents have a right to make, the restriction of "the free flow of truthful information" constitutes a "basic" constitutional defect regardless of the strength of the government's interest. *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 95–96 (1977).

## IV

We thus conclude that the justifications offered by appellants are insufficient to warrant the sweeping prohibition on the mailing of unsolicited contraceptive advertisements. As applied to appellee's mailings, § 3001(e)(2) is unconstitutional. The judgment of the District Court is therefore

*Affirmed.*

JUSTICE BRENNAN took no part in the decision of this case.

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

---

opinion). We need not rely on such considerations in this case because of the impact of the statute on the flow of information to parents. Yet it cannot go without notice that adolescent children apparently have a pressing need for information about contraception. Available data indicate that, in 1978, over one-third of all females aged 13–19 (approximately five million people) were sexually active. Dryfoos, Contraceptive Use, Pregnancy Intentions and Pregnancy Outcomes Among U. S. Women, 14 Family Planning Perspectives 81, 83 (1982). Approximately 30% of these sexually active teenage females became pregnant during 1978; over 70% of these pregnancies (roughly 1.2 million) were unintended. *Id.*, at 88. Almost half a million teenagers had abortions during 1978. *Ibid.*

I agree that the judgment should be affirmed, but my reasoning differs from that of the Court. The right to use the mails is undoubtedly protected by the First Amendment, *Blount* v. *Rizzi*, 400 U. S. 410 (1971). But because the home mailbox has features which distinguish it from a public hall or public park, where it may be assumed that all who are present wish to hear the views of the particular speaker then on the rostrum, it cannot be totally assimilated for purposes of analysis with these traditional public forums. Several people within a family or living group may have free access to a mailbox, including minor children; and obviously not every piece of mail received has been either expressly or impliedly solicited. It is the unsolicited mass mailings sent by appellee designed to promote the use of condoms that gives rise to this litigation.

Our earlier cases have developed an analytic framework for commercial speech cases.

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 566 (1980).

The material that Youngs seeks to mail concerns lawful activity and is not misleading. The Postal Service does not contend otherwise.

The Postal Service does contend that the Government has substantial interests in "aiding parents' efforts to discuss sensitive and important subjects such as birth control with their

children," Brief for Appellants 25, and in preventing material that the recipient may find offensive from entering the home on an unsolicited basis. *Id.*, at 30. The Government is entitled, the argument goes, to help individuals shield their families and homes from advertisements for contraceptives.[1]

The first of these interests is undoubtedly substantial. Contraception is an important and sensitive subject, and parents may well prefer that they provide their children with information on contraception in their own way. "[P]arents have an important 'guiding role' to play in the upbringing of their children . . . which presumptively includes counseling them on important decisions." *H. L.* v. *Matheson,* 450 U. S. 398, 410 (1981), quoting *Bellotti* v. *Baird,* 443 U. S. 622, 637 (1979). For this reason, among others, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. . . . The legislature could properly conclude that parents . . . , who have this primary responsibility for children's well being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg* v. *New York,* 390 U. S. 629, 639 (1968).

The second interest advanced by the Postal Service is also substantial. We have often recognized that individuals have a legitimate "right to be left alone" "in the privacy of the home," *FCC* v. *Pacifica Foundation,* 438 U. S. 726, 748

---

[1] The Postal Service acknowledges that these justifications were not the reasons why § 3001(e)(2) was originally enacted. This provision began as part of the Comstock Act, a statute enacted "for the suppression of Trade in and Circulation of obscene Literature and Articles of immoral Use." Act of Mar. 3, 1873, ch. 258, § 2, 17 Stat. 599. The Postal Service is entitled to rely on legitimate interests that the statute now serves, even if the original reasons for enacting the statute would not suffice to support it against a First Amendment challenge. *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 460 (1978). See also *Doe* v. *Bolton,* 410 U. S. 179, 190–191 (1973) (a State may readjust its views and emphases in light of modern knowledge).

(1978), "the one place where people ordinarily have the right not to be assaulted by uninvited and offensive sights and sounds." *Id.*, at 759 (opinion of POWELL, J.). Accord, *Rowan* v. *Post Office Dept.*, 397 U. S. 728, 736–738 (1970). The Government may properly act to protect people from unreasonable intrusions into their homes.

The questions whether § 3001(e)(2) directly advances these interests, and whether it is more extensive than necessary, are more problematic. Under 39 U. S. C. § 3008, an individual can have his name removed from Youngs' mailing list if he so wishes. See *Rowan* v. *Post Office Dept.*, *supra* (holding § 3008 constitutional). Thus, individuals are able to avoid the information in Youngs' advertisements after one exposure. Furthermore, as we noted in *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 542 (1980), the recipient of Youngs' advertising "may escape exposure to objectionable material simply by transferring [it] from envelope to wastebasket."[2] Therefore a mailed advertisement is significantly less intrusive than the daytime broadcast at issue in *Pacifica* or the sound truck at issue in *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). See *Consolidated Edison*, 447 U. S., at 542–543. Where the recipients can "'effectively avoid further bombardment of their sensibilities simply by averting their eyes,'" *id.*, at 542, quoting *Cohen* v. *California*, 403 U. S. 15, 21 (1971), a more substantial governmental interest is necessary to justify restrictions on speech.

---

[2] Under the restrictions imposed by the District Court, see *ante*, at 64, n. 5, the recipient will be explicitly informed of his right under § 3008. He will also know the nature of Youngs' mailing without opening the envelope, and thus be able to avoid the advertisement entirely by transferring it directly from mailbox to wastebasket.

Youngs did not file a cross-appeal challenging these restrictions, so I see no occasion to consider whether the District Court acted properly. Nor would I consider whether these restrictions would be valid if Congress were to enact them.

Although § 3001(e)(2) does advance the interest in permitting parents to guide their children's education concerning contraception, it also inhibits that interest by denying parents access to information about birth control that might help them make informed decisions. This statute acts "to prevent [people] from obtaining certain information." *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 96 (1977). The First Amendment, which was designed to prevent the Government from suppressing information, requires us "to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 770 (1976).

Section 3001(e)(2) is also broader than is necessary because it completely bans from the mail unsolicited materials that are suitable for adults. The Government may not "reduce the adult population . . . to reading only what is fit for children." *Butler* v. *Michigan,* 352 U. S. 380, 383 (1957). Narrower restrictions, such as the provisions of 39 U. S. C. § 3008 and restrictions of the kind suggested by the District Court in this case, can fully serve the Government's interests.

The Postal Service argues that Youngs can obtain permission to send its advertisements by conducting a "premailing." Youngs could send letters to the general public, asking whether they would be willing to receive information about contraceptives, and send advertisements only to those who respond. In a similar vein, the Postal Service argues that Youngs can communicate with the public otherwise than through the mail.[3] Both of these arguments fall wide of the

---

[3] See generally, *e. g.,* The Washington Post, May 4, 1983, p. B20 (drugstore advertisement for numerous items, including condoms manufactured by Youngs and contraceptive jelly).

mark.  A prohibition on the use of the mails is a significant restriction of First Amendment rights.  We have noted that "'[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues.'"  *Blount* v. *Rizzi,* 400 U. S., at 416, quoting *Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U. S. 407, 437 (1921) (Holmes, J., dissenting).  And First Amendment freedoms would be of little value if speakers had to obtain permission of their audiences before advancing particular viewpoints.  Cf. *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965) (statute requiring Post Office to obtain authorization from addressee before delivering certain types of mail violates addressee's First Amendment rights).

Thus, under this Court's cases the intrusion generated by Youngs' proposed advertising is relatively small, and the restriction imposed by § 3001(e)(2) is relatively large.  Although this restriction directly advances weighty governmental interests, it is somewhat more extensive than is necessary to serve those interests.  On balance I conclude that this restriction on Youngs' commercial speech[4] has not been adequately justified.  Section 3001(e)(2) therefore violates the First Amendment as applied to Youngs and to material of the type Youngs has indicated that it plans to send, and I agree that the judgment of the District Court should be affirmed.

JUSTICE STEVENS, concurring in the judgment.

Two aspects of the Court's opinion merit further comment: (1) its conclusion that all of the communications at issue are properly classified as "commercial speech" (*ante,* at 68); and (2) its virtually complete rejection of offensiveness as a possi-

---

[4] Since the Court finds § 3001(e)(2) invalid under the cases involving commercial speech, I would not reach Youngs' argument that its materials are entitled to the broader protection afforded noncommercial speech.

bly legitimate justification for the suppression of speech (*ante,* at 72). My views are somewhat different from the Court's on both of these matters.

## I

Even if it may not intend to do so, the Court's opinion creates the impression that "commercial speech" is a fairly definite category of communication that is protected by a fairly definite set of rules that differ from those protecting other categories of speech. That impression may not be wholly warranted. Moreover, as I have previously suggested, we must be wary of unnecessary insistence on rigid classifications, lest speech entitled to "constitutional protection be inadvertently suppressed." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York,* 447 U. S. 557, 579 (1980) (STEVENS, J., concurring in judgment).

I agree, of course, that the commercial aspects of a message may provide a justification for regulation that is not present when the communication has no commercial character. The interest in protecting consumers from commercial harm justifies a requirement that advertising be truthful; no such interest applies to fairy tales or soap operas. But advertisements may be complex mixtures of commercial and noncommercial elements: the noncommercial message does not obviate the need for appropriate commercial regulation (see *ante,* at 68); conversely, the commercial element does not necessarily provide a valid basis for noncommercial censorship.

Appellee's pamphlet entitled "Plain Talk about Venereal Disease" highlights the classification problem. On the one hand, the pamphlet includes statements that implicitly extol the quality of the appellee's products.[1] A law that protects

---

[1] The pamphlet states that it was contributed by the appellee as a public service, identifying the brand name of appellee's products. It also states: "Ethical Manufacturers require strict standards of strength, durability, and reliability in manufacturing condoms. (prophylactics) Each condom

the public from suffering commercial harm as a result of such statements would appropriately be evaluated as a regulation of commercial speech. On the other hand, most of the pamphlet is devoted to a discussion of the symptoms, significant risks, and possibility of treatment for venereal disease.[2] That discussion does not appear to endanger any commercial interest whatsoever; it serves only to inform the public about a medical issue of regrettably great significance.

I have not yet been persuaded that the commercial motivation of an author is sufficient to alter the state's power to regulate speech. Anthony Comstock surely had a constitutional right to speak out against the use of contraceptives in his day. Like Comstock, many persons today are morally opposed to contraception, and the First Amendment commands the government to allow them to express their views in appropriate ways and in appropriate places. I believe that Amendment affords the same protection to this appellee's views regarding the hygienic and family planning advantages of its contraceptive products.

Because significant speech so often comprises both commercial and noncommercial elements, it may be more fruitful to focus on the nature of the challenged regulation rather

---

must be individually tested to assure a quality condom." App. to Brief for Appellee 31.

[2] For example, the pamphlet includes the following question and answer: "WHAT ARE THE EARLY SYMPTOMS OR SIGNS OF SYPHILIS? "The first sign of infection is a single, painless sore where the germ has entered the body. This sore is called a Chancre (pronounced shank-er). It appears between two to six weeks after exposure to the infected person. This Chancre or sore will disappear even without treatment, but this only means that the disease has gone deeper into the body. *The disease is not cured.* The secondary stage of Syphilis which begins two to six months after the Chancre, can include skin rashes over all or part of the body, baldness, sore throat, fever and headaches. Even these will disappear without treatment, *but the disease is still in the body* . . . just waiting to create such 'final' problems as crippling the nervous system, syphilitic insanity, heart disease and death." *Id.*, at 28.

than the proper label for the communication. Cf. Farber, Commercial Speech and First Amendment Theory, 74 Nw. U. L. Rev. 372, 386–390 (1979). The statute at issue in this case prohibits the mailing of "[a]ny unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception." Any legitimate interests the statute may serve are unrelated to the prevention of harm to participants in commercial exchanges.[3] Thus, because it restricts speech by the appellee that has a significant noncommercial component, I have scrutinized this statute in the same manner as I would scrutinize a prohibition on unsolicited mailings by an organization with absolutely no commercial interest in the subject.

## II

Assuming that this case deals only with commercial speech, the Court implies, if it does not actually hold, that the fact that protected speech may be offensive to some persons is not a "sufficient justification for a prohibition of commercial speech." *Ante*, at 72. I think it essential to emphasize once again, however, that

> "a communication may be offensive in two different ways. Independently of the message the speaker intends to convey, the form of his communication may be offensive—perhaps because it is too loud or too ugly in a particular setting. Other speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message." *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 546–548 (1980) (STEVENS, J., concurring in judgment) (footnotes omitted).

---

[3] Because the right to decide whether to bear or beget a child is constitutionally protected, a government may not justify inhibiting access to contraceptives by claiming that, by their very nature, they harm consumers. See *Carey* v. *Population Services International*, 431 U. S. 678 (1977).

It matters whether a law regulates communications for their ideas or for their style. Governmental suppression of a specific point of view strikes at the core of First Amendment values.[4] In contrast, regulations of form and context may strike a constitutionally appropriate balance between the advocate's right to convey a message and the recipient's interest in the quality of his environment:

> "The fact that the advertising of a particular subject matter is *sometimes* offensive does not deprive all such advertising of First Amendment protection; but it is equally clear to me that the existence of such protection does not deprive the State of all power to regulate such advertising in order to minimize its offensiveness. A picture which may appropriately be included in an instruction book may be excluded from a billboard." *Carey* v. *Population Services International,* 431 U. S. 678, 717 (1977) (opinion of STEVENS, J.).

The statute at issue in this case censors ideas, not style. It prohibits appellee from mailing any unsolicited advertisement of contraceptives, no matter how unobtrusive and tactful; yet it permits anyone to mail unsolicited advertisements of devices intended to facilitate conception, no matter how coarse or grotesque. It thus excludes one advocate from a forum to which adversaries have unlimited access. I concur in the Court's judgment that the First Amendment prohibits the application of the statute to these materials.

---

[4] See *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 63 (1976) (opinion of STEVENS, J.).