CHIN, J.
I respectfully dissent.
Nike, Inc. (Nike), is a major international corporation with a multibilliondollar enterprise. The nature of its labor practices has become a subject of considerable public interest and scrutiny. Various persons and organizations have accused Nike of engaging in despicable practices, which they have described sometimes with such caustic and scathing words as “slavery” and “sweatshop.” Nike’s critics and these accusations receive full First Amendment protection. And well they should. “The First and Fourteenth Amendments embody our ‘profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open ....’” (Garrison v. Louisiana (1964) 379 U.S. 64, 75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125] (Garrison), quoting New York Times Co. v. Sullivan (1964) 376 U.S. 254, 270 [84 S.Ct. 710, 721, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].) “Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.” (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339-340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789], fn. omitted.)
While Nike’s critics have taken full advantage of their right to “ ‘uninhibited, robust, and wide-open’ ” debate (Garrison, supra, 379 U.S. at p. 75 [85 S.Ct. at p. 216]), the same cannot be said of Nike, the object of their ire. *971 When Nike tries to defend itself from these attacks, the majority denies it the same First Amendment protection Nike’s critics enjoy. Why is this, according to the majority? Because Nike competes not only in the marketplace of ideas, but also in the marketplace of manufactured goods. And because Nike sells shoes—and its defense against critics may help sell those shoes—the majority asserts that Nike may not freely engage in the debate, but must run the risk of lawsuits under California’s unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and false advertising law (Bus. & Prof. Code, § 17500 et seq.), should it ever make a factual claim that turns out to be inaccurate. According to the majority, if Nike utters a factual misstatement, unlike its critics, it may be sued for restitution, civil penalties, and injunctive relief under these sweeping statutes. (Maj. opn., ante, at pp. 949-951.)
Handicapping one side in this important worldwide debate is both ill considered and unconstitutional. Full free speech protection for one side and strict liability for the other will hardly promote vigorous and meaningful debate. “Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.” (Garrison, supra, 379 U.S. at p. 73 [85 S.Ct. at p. 215].) The state, “even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government.” (Riley v. National Federation of Blind (1988) 487 U.S. 781, 791 [108 S.Ct. 2667, 2675, 101 L.Ed.2d 669] (Riley).)
In its pursuit to regulate Nike’s speech—in hope of prohibiting false and misleading statements—the majority has unduly trammeled basic constitutional freedoms that form the foundation of this free government.[1] “[W]here . . . suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended.” (First National Bank of Boston v. Bellotti (1978) 435 U.S. 765, 785-786 [98 S.Ct. 1407, 1420-1421, 55 L.Ed.2d 707], fn. omitted (Belloti).)
I. Irrespective of Nike’s Economic Motivation, the Public Has a Right to Receive Information on Matters of Public Concern
The United States Supreme Court has emphasized that economic motivation—in this case, Nike’s desire to sell athletic products—is not a dispositive *972 factor in determining whether certain speech is commercial. (Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 67 [103 S.Ct. 2875, 2880-2881, 77 L.Ed.2d 469] (Bolger).) In deciding the scope of the constitutional protection of corporate speech, the high court struck down a Massachusetts criminal statute that proscribed corporations from giving campaign contributions to influence the vote on a referendum materially affecting the corporation’s property, business, or assets. (Bellotti, supra, 435 U.S. 765.) Corporate speech, the high court noted, did not deserve less protection simply because of its source. “The question in this case, simply put, is whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection.” (Id. at p. 778 [98 S.Ct. at p. 1416].) In Nike’s case, based on the majority’s holding, it does.
As the Court of Appeal below noted, given Nike’s powerful corporate image and industry stronghold, the private company “exemplifi[ed] the perceived evils or benefits of labor practices associated with the processes of economic globalization.” Nike, in effect, became the “poster child” in the international campaign for labor rights and reform (see, e.g., Note, Now Playing: Corporate Codes of Conduct in the Global Theater: Is Nike Just Doing It? (1998) 15 Ariz. J. Inti. & Comp. L. 905), and Nike’s labor practices became relevant in a much broader, and public, context. Though expressions on labor disputes have been afforded full First Amendment protection (see Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 762 [96 S.Ct. 1817, 1825-1826, 48 L.Ed.2d 346] (Va. Pharmacy Bd.), and cases cited; Thornhill v. Alabama (1940) 310 U.S. 88, 101-103 [60 S.Ct. 736, 743-745, 84 L.Ed. 1093] (Thornhill)), the majority loses sight of the full protections afforded this speech in the face of Nike’s corporate identity. (Bellotti, supra, 435 U.S. at p. 778 [98 S.Ct. at p. 1416].) And because of this myopia, the public loses.
The public at large, in addition to Nike’s actual and intended customers, has the right to receive Information from both sides of this international debate. “Freedom of speech presupposes a willing speaker. But where a speaker exists ... the protection afforded is to the communication, to its source and to its recipients both.” (Va. Pharmacy Bd., supra, 425 U.S. at p. 756 [96 S.Ct. at p. 1823], fn. omitted.) The First Amendment serves an “informational purpose” that guarantees “the public access to discussion, debate, and the dissemination of information and ideas.” (Bellotti, supra, 435 U.S. at p. 782, fn. 18 [98 S.Ct. at p. 1419]; id. at p. 783 [98 S.Ct. at p. 1419]; see Bigelow v. Virginia (1975) 421 U.S. 809, 822 [95 S.Ct. 2222, 2232-2235, 44 L.Ed.2d 600] (Bigelow).) Thus, not only Nike, but all of us, are the poorer for the majority’s assault on free speech.
*973 In striking down Virginia’s attempt to ban a newspaper advertisement announcing the availability of legal New York abortions, the high court noted: “The advertisement. . . did more than simply propose a commercial transaction. It contained factual material of clear ‘public interest.’ Portions of its message . . . involve the exercise of the freedom of communicating information and disseminating opinion. [¶] Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia. . . . Thus, in this case, appellant’s First Amendment interests coincided with the constitutional interests of the general public.” (Bigelow, supra, 421 U.S. at p. 822 [95 S.Ct. at pp. 2232-2233], fn. omitted, italics added; Jacoby v. State Bar (1977) 19 Cal.3d 359, 370-371 [138 Cal.Rptr. 77, 562 P.2d 1326, 4 A.L.R.4th 273] [following Bigelow]; cf. Bolger, supra, 463 U.S. at p. 68 [103 S.Ct. at p. 2881] [company may not “immunize false or misleading product information from government regulation simply by including references to public issues”].)
Here, Nike’s statements regarding its labor practices in China, Vietnam, and Indonesia provided vital information on the very public controversy concerning using low-cost foreign labor to manufacture goods sold in America. Nike’s responses defended against adverse reports that its overseas manufacturers committed widespread labor, health, and safety law violations. Far from promoting the sale of its athletic products, Nike did not include this information through product labels, inserts, packaging, or commercial advertising intended to reach only Nike’s actual or potential customers. Rather, Nike responded to the negative publicity through press releases, letters to newspapers, and letters to university presidents and athletic directors. (Cf. Bolger, supra, 463 U.S. 60 [contraceptive manufacturer’s informational pamphlets included with advertisements deemed commercial speech].) To the extent Nike may have been financially motivated to defend its business and livelihood against these attacks, this motivation is not dispositive in identifying speech as commercial. (Bolger, supra, 463 U.S. at p. 67 [103 S.Ct. at pp. 2880-2881].) “Viewed in its entirety, [Nike’s speech] conveyed information of potential interest and value to a diverse audience . . . .” (Bigelow, supra, 421 U.S. at p. 822 [95 S.Ct. at p. 2232].)
II. Nike’s Speech Is Not Traditional Commercial Speech
Indeed, characterizing Nike’s speech here as commercial speech is inconsistent with the high court’s constitutional jurisprudence for yet another *974 reason.[2] The high court has stated that traditional commercial speech is speech that “does ‘no more than propose a commercial transaction.’ ” (Va. Pharmacy Bd., supra, 425 U.S. at p. 762 [96 S.Ct. at p. 1825]; Bolger, supra, 463 U.S. at p. 66 [103 S.Ct. at pp. 2879-2880]; see also Board of Trustees, State Univ. of N. Y. v. Fox (1989) 492 U.S. 469, 473 [109 S.Ct. 3028, 3030-3031, 106 L.Ed.2d 388]; Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 637 [105 S.Ct. 2265, 2274, 85 L.Ed.2d 652]; but see Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. at p. 561 [100 S.Ct. at pp. 2348-2349] [commercial speech is “expression related solely to the economic interests of the speaker and its audience”].) In this case, Nike’s speech here went beyond proposing a commercial transaction. It provided information vital to the public debate on international labor rights and reform. As the Court of Appeal below observed, “[information about the labor practices at Nike’s overseas plants . . . constitute^] data relevant to a controversy of great public interest in our times.”
Contrary to the majority’s assertions (see maj. opn., ante, at p. 966), the high court’s restriction—“advertising which ‘links a product to a current public debate’ is not thereby entitled to the constitutional protection afforded noncommercial speech” (Bolger, supra, 463 U.S. at p. 68 [103 S.Ct. at p. 2881])—does not apply here. In Bolger, the informational mailings, though containing issues of public concern such as venereal disease and family planning, were at bottom commercial speech directed at selling contraceptives. (Id. at p. 66 [103 S.Ct. at pp. 2879-2880].) The court made clear that most of the mailings fell “within the core notion of commercial speech— ‘speech which does “no more than propose a commercial transaction.” ’ ” (Ibid.) To the extent that some mailings discussed public concerns, the high court cautioned that “[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.” (Id. at p. 68 [103 S.Ct. at p. 2881].)
In a case decided before Bolger, the high court held that a utility company’s monthly electric bill inserts advocating the use of nuclear power could *975 not be regulated under the First and Fourteenth Amendments. (Consolidated Edison Co. v. Public Serv. Comm’n (1980) 447 U.S. 530 [100 S.Ct 2326, 65 L.Ed.2d 319] (Consolidated Edison).) In Consolidated Edison, the high court did not address whether the inserts constituted commercial speech. Rather, it concluded that the utility commission’s regulation banning the inserts “limited the means by which Consolidated Edison may participate in the public debate on this question and other controversial issues of national interest and importance. Thus, the Commission’s prohibition of discussion of controversial issues strikes at the heart of the freedom to speak.” (Id. at p. 535 [100 S.Ct. at p. 2332].) Despite Consolidated Edison’s obvious economic incentive in promoting the use of nuclear power, the high court did not consider, much less determine, whether the inserts placed in electric bills amounted to commercial speech.
The high court’s concern in Bolger, supra, 463 U.S. 60, therefore, was that advertisers refrain from inserting information on public issues as a pretext to avoid regulations governing their commercial speech.[3] That is simply not the case here. Nike’s speech—in the form of press releases and letters defending against accusations about its overseas labor practices—was not in any sense pretextual, but prompted and necessitated by public criticism. As noted, Nike did not use product labels, packaging, advertising, or other media intended to directly reach its actual or potential customers. Nike’s speech did not “simply . . . include[] references to public issues.” (Bolger, supra, 463 U.S. at p. 68 [103 S.Ct. at p. 2881].) Nike’s labor practices and policies, and in turn, its products, were the public issue. Its “discussion of controversial issues strikes at the heart of the freedom to speak.” (Consolidated Edison, supra, 447 U.S. at p. 535 [100 S.Ct. at p. 2332].)
At the very least, this case typifies the circumstance where commercial speech and noncommercial speech are “inextricably intertwined.” (Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) In Riley, the high court held that a North Carolina statute regulating solicitation of charitable contributions affected protected speech and was not narrowly tailored to meet the state’s interest in protecting charities from fraud. (Id. at p. 789 [108 S.Ct. at pp. 2673-2674].) As relevant here, the court observed that even if a professional fundraiser’s speech amounted to commercial speech, “we do not *976 believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.” (Id. at p. 796 [108 S.Ct. at p. 2677].) It further held that “where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression.” (Ibid.)
Notwithstanding the fact that Riley dealt with charitable solicitations, which are not involved in this case, the high court relied, in part, on a case that provides insight here. (Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677], citing Thomas v. Collins (1945) 323 U.S. 516, 540-541 [65 S.Ct. 315, 327-328, 89 L.Ed. 430] (Thomas).) In Thomas, which did not deal with solicitation of property or funds, the high court addressed the issue whether a union organizer’s speech soliciting members was protected by the First Amendment, and whether a registration requirement in order to speak was constitutionally impermissible. (Thomas, supra, 323 U.S. at pp. 533-534 [65 S.Ct. at pp. 324-325].) Answering yes to both questions, the high court cautioned that a state’s regulation, “whether aimed at fraud or other abuses, must not trespass upon the domain set apart for free speech and free assembly. This Court has recognized that ‘in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modem industrial society.’ ” (Id. at p. 532 [65 S.Ct. at p. 323], quoting Thornhill, supra, 310 U.S. at pp. 102, 103 [60 S.Ct. at pp. 744-745].)[4]
This case resembles Thomas in that Nike’s speech provided information “ ‘concerning the conditions in [the manufacturing] industry’ ” and thereby used “ ‘the processes of popular government to shape the destiny of modem industrial society.’ [Citation.]” (Thomas, supra, 323 U.S. at p. 532 [65 S.Ct. at p. 323], quoting Thornhill, supra, 310 U.S. at p. 102 [60 S.Ct. at p. 744].) Nike, which came to the forefront of the international labor abuse debate, provided relevant information about its labor practices in its overseas plants. *977 Nike’s speech, in an attempt to influence public opinion on economic globalization and international labor rights and working conditions, gave the public insight and perspective into the debate. This speech should be fully protected as “essential to free government.” (Thornhill, supra, 310 U.S. at p. 95 [60 S.Ct. at p. 741].)
The majority’s attempt to parse out Nike’s noncommercial speech—“to the extent Nike’s speech represents expression of opinion or points of view on general policy questions ... it is noncommercial speech” (maj. opn., ante, at p. 967, italics added)—is both unavailing and unhelpful. Even assuming that Nike’s factual statements regarding how its products are made constitute commercial speech, that speech is “inextricably intertwined” with its noncommercial speech. (Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) Contrary to the majority’s suggestion (maj. opn., ante, at pp. 966-967), Nike realistically could not discuss its general policy on employee rights and working conditions and its views on economic globalization without reference to the labor practices of its overseas manufacturers, Nike products, and how they are made. Attempting to parse out the commercial speech from the noncommercial speech in this context “would be both artificial and impractical.” (Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].)
III. Conclusion
The majority today refuses to honor a fundamental commitment and guarantee that both sides in a public debate may compete vigorously—and equally—in the marketplace of ideas. The First Amendment ensures the freedom to speak on matters of public interest by both sides, not just one judicially favored. (Bellotti, supra, 435 U.S. at pp. 785-786 [98 S.Ct. at pp. 1420-1421].) Sadly, Nike is not the only one who loses here—the public does, too. “Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion.” (Thornhill, supra, 310 U.S. at p. 95 [60 S.Ct. at p. 741].)
Because I would give both sides in this important public controversy the full protection that our Constitution guarantees, I respectfully dissent.
Baxter, J., concurred.

I take no sides in this public debate. Who is right and who is wrong is not for me, or the majority, to decide. It is for the public—fully informed as the First Amendment guarantees—to judge. (Gertz v. Robert Welch, Inc., supra, 418 U.S. at pp. 339-340 [94 S.Ct. at pp. 3006-3007].)

While the majority correctly observes that in this constitutional analysis, “the very first question is whether the speech that the law regulates is entitled to First Amendment protection at all” (maj. opn., ante, at p. 968), it conflates this question with the issue whether commercial speech may be regulated, the latter a foregone conclusion. (Bolger, supra, 463 U.S. at p. 65 [103 S.Ct. at p. 2879].) Advocating what it calls a “limited-purpose” definition of commercial speech (maj. opn., ante, at pp. 960, 966-967), the majority proposes that a company’s factual statements about its products or services are commercial and subject to regulation if these statements are “false or misleading.” (Id. at p. 968.) In other words, the majority concludes “a law that prohibits only such unprotected speech cannot violate constitutional free speech provisions.” (Ibid.) Whether a company’s statements are allegedly false or misleading does not determine the threshold question at issue in this case—whether the speech is commercial or noncommercial. (See Central Hudson Gas & Elec. v. Public Serv. Comm’n (1980) 447 U.S. 557, 566 [100 S.Ct. 2343, 2351, 65 L.Ed.2d 341].)

The phrase “ ‘does “no more than propose a commercial transaction” ’ ” (Bolger, supra, 463 U.S. at p. 66 [103 S.Ct. at p. 2880]) “must be understood to reflect judgments about ‘the character of the expressive activity’ at issue judgments that necessarily entail an assessment of the nature and constitutional significance of the larger social practice within which that activity is embedded. That is why commercial speech cannot be transformed into public discourse merely by altering its content to insert assertions about matters of public concern.” (Post, The Constitutional Status of Commercial Speech (2000) 48 UCLA L.Rev. 1, 18-19, fns. omitted.)

Contrary to the majority’s suggestion (maj. opn., ante, at p. 965), the fact that the high court decided both Thornhill, supra, 310 U.S. 88, and Thomas, supra, 323 U.S. 516, before its seminal cases on commercial speech, does not make these earlier cases’ affirmation of fundamental principles on First Amendment protection less pertinent. Indeed, the high court relied, in part, on Thornhill, supra, 310 U.S. at page 102 [60 S.Ct. at page 744], in Va. Pharmacy Bd., supra, 425 U.S. at page 762 [96 S.Ct. at page 1826], to conclude that “[t]he interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome.”