PRIMARY CARE PHYSICIANS GROUP, P.C. and Jean M. Cardin, M.D., Plaintiffs,

v.

James J. LEDBETTER, individually and in his capacity as Commissioner of the Dept. of Human Res., W. Scott Sprinkle, individually and in his capacity as Director of the Office of Regulatory Service, Div. of Adm. Services, Ga. Dept. of Human Resources, and Georgia Department of Human Resources, an agency of the state of Georgia, Defendants.

Civ. A. No. C84–766A.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 21, 1986.

Craig Goodrich, Casson, Calligaro & Mutryn, Washington, D.C., Glover McGhee and G. Bland Byrne, Swift, Currie, McGhee & Hiers, Atlanta, Ga., for plaintiffs.

Mary Foil Russell, Atlanta, Ga., for defendants.

## ORDER

VINING, District Judge.

In this action for declaratory and injunctive relief, the plaintiffs challenge the constitutionality of a state statute and regulations promulgated thereunder. Pending before the court is the plaintiffs' motion for summary judgment.

In 1982 the Georgia General Assembly amended the list of health care institutions subject to regulation and licensure by the Georgia Department of Human Resources to include free standing emergency care clinics (FECC's). This was accomplished by adding the following to the list of definitions of an "institution" subject to regulation and licensure by DHR:

> Any building or facility, not directly associated with a hospital, which is devoted primarily to the provision, on a nonrecurring basis, of medical treatment to patients with acute injuries or conditions and which is classified by the Depart-

ment of Human Resources as a free standing emergency care clinic. O.C.G.A. § 31–7–1(1)(F).

Pursuant to O.C.G.A. § 31–7–2, the Department of Human Resources promulgated the FECC regulations which form the basis for this law suit. Under those regulations, an FECC was defined as follows:

[A]ny facility, physically distinct from a hospital, which is represented in its name or advertising material as a place where emergency medical care is available to the public for treatment of acute injuries or conditions; any facility which uses a red or red outlined cross on any facility sign or in any advertising or as part of its name or in its represented services uses a term such as, "emergency", "immediate", "crises", "urgent", "sudden", "acute", or a similar meaning term shall come within this definition; the phrase 'no appointment necessary' or 'patients promptly seen' shall not come within this definition.

Official Compilation of Rules and Regulations of the State of Georgia § 290–5–42–.01(e) [hereinafter cited as "Ga. Regs."].

Both the regulations and the statute specifically exempt private physicians' offices from the regulatory and licensure requirements. *See* O.C.G.A. § 31–7–1(1); Ga. Regs. § 290–5–42–.02.

The regulations impose numerous requirements upon FECCs that are not required of private physicians' offices. Among these requirements are the provisions that the FECCs must have (1) "a governing body," (2) extensive written policies regarding qualifications and responsibilities of the staff and type of cases treated, (3) an answering service for the receipt of phone calls when the facility is not open, (4) a medical director, (5) a coordinator of nursing services, (6) an administrator, (7) a laboratory technician and an X-ray technician, (8) an extensive clinical laboratory and diagnostic radiology services, (9) extensive physical plant and equipment, such as a ventilation and blower system providing two replacements of air volume in the facility per hour, and (10) written policies regarding patient follow-up and referral for patients who required treatment not available at the facility. In addition, the facility must be open for inspection by state officials during its business hours, must preserve medical records for at least six years after a patient's discharge and, for minors, for at least six years after the patient reaches the age of majority, and must retain copies (including tapes from electronic media) or photographs of all advertising materials for at least two years after their last use.

The regulations provide that no FECC shall be operated in Georgia without a valid permit, and the regulations provide that the failure of or refusal by the governing body of a FECC existing at the time the rules become effective to file an application within ninety days will constitute a violation of law. The failure to file for an application for a permit or otherwise to comply with the regulations can result in criminal penalties and injunctive relief.

Primary Care Physicans Group, P.C., is a Georgia professional corporation. Jean Cardin is a doctor of medicine, licensed under the laws of the State of Georgia, and is the president and owner of P.C.P.G. P.C.P.G. is a physicians' group which provides physicians at approximately twenty different "Humana MedFirst" locations throughout the Atlanta, Georgia, area in facilities leased from PMM, Inc., a professional health management firm and subsidiary of Humana, Inc. P.C.P.G. provides the physician services in the facilities, and PMM provides all non-physician staff; additionally, PMM provides business management and support services, including patient billing and collection services. PMM also provides all advertising for the facilities.

The health care services provided at the P.C.P.G. facilities are typical of those provided by family care practitioners throughout the state of Georgia, including care and initial treatment of, and follow-up care for, minor and sudden injuries and illnesses.

P.C.P.G., however, does not provide services for life- or limb-threatening conditions.

Although similar to traditional physicians' offices and the medical services they provide, the MedFirst offices are unlike the traditional physicians' offices in several respects. The facilities offer extended-hour care, typically twelve hours a day, seven days a week; the facilities are usually near a major thoroughfare and are generally more convenient to patients than are the traditional physicians' offices (which normally are located in proximity to a hospital or other major health care facility). Although MedFirst physicians do accept patients on an appointment basis, no appointment is necessary. One of the most significant differences, however, is that P.C.P.G. advertises the availability of its services both on signs at the facilities and through brochures made available to the general public. Indeed, it is the advertising by P.C.P.G. which forms the very crux of this litigation.

Although both sides couch their arguments in constitutional terms, the heart of this case and the gravamen of each sides' position are well reflected in the following excerpts from the parties' briefs with respect to the plaintiffs' motion for summary judgment. (In these excerpts, deposition references and footnotes have been omitted.)

PLAINTIFFS (Brief at 3–4):

Defendants have devised a regulatory scheme which hinges regulatory coverage solely upon the presence or absence of advertising. Moreover, the advertising that triggers regulation is not—as one might reasonably expect—advertising that emergency services are provided. Instead, the regulations apply if a physician's office represents availability to treat minor injuries and sudden illnesses, services routinely provided by family care physicians in their offices throughout the State of Georgia.

The anomalous result of defendants' regulatory scheme is to require any physician who advertises the ability to promptly treat minor or sudden injury or illness to become a full-fledged emergency room, even though the physician neither advertises nor provide [sic] emergency care. Heightening the anomaly, physicians who routinely provide treatment for the same injuries and illnesses as do plaintiffs—as well as facilities which in fact do treat life-threatening injuries and conditions—are not subject to regulation if they do not advertise.

DEFENDANTS (Brief at 6–7):

Plaintiffs have brought this action to challenge the regulations based upon their allegations that the regulations impermissibly restrain their right to advertise their services under the First Amendment. However, Defendants have consistently maintained that it is not the fact of advertising medical services that brings a facility within the ambit of the regulations and statute. Instead it is the substance of that advertising, *i.e.*, a facility which advertises the availability of medical treatment for minor medical emergencies is subject to regulation as a free standing emergency care clinic. Therefore, the regulations are premised upon the proposition that a facility which holds itself out as providing emergency medical care is in fact providing that care and should be able to do so under minimum standards. The regulations identify the provision of emergency medical services based upon what the facility states to the public that it is providing.

The term "emergency medical care" used in this definition is itself defined as "medical care provided for a condition which either necessitates immediate treatment or is perceived by the patient as necessitating immediate treatment." Ga.Regs. § 290–5–42–.01(d).

■ Although commercial speech, i.e., "expression related solely to the economic interest of the speaker and its audience," is entitled to First Amendment protection, the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Electric Corporation v.*

*Public Service Commission of New York,* 447 U.S. 557, 561, 563, 100 S.Ct. 2343, 2349, 2350, 65 L.Ed.2d 341 (1980). In *Central Hudson* the Supreme Court enunciated the following four-part analysis to be used in determining whether state regulation of commercial speech is justified:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351.

Furthermore, the Supreme Court has stated, "The parties seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71, n. 20, 103 S.Ct. 2875, 2882, n. 20, 77 L.Ed.2d 469 (1983).

It is uncontested that P.C.P.G.'s advertising concerns a lawful activity, *viz.,* the providing of health care. However, there is strident disagreement among the parties as to whether P.C.P.G.'s advertising is misleading or, of greater significance, is potentially misleading. Such disagreement is understandable, since regulation of commercial speech is "permissible where the particular advertising is inherently likely to deceive or where the record indicates a particular form or method of advertising has in fact been deceptive." *In re R.M.J.,* 455 U.S. 191, 202, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). However, in noting that misleading advertising may be prohibited entirely, the Supreme Court also held that "the states could not place an absolute prohibition on certain types of potentially misleading information, if the information also may be presented in a way that is not deceptive," noting that "restrictions upon such advertising may be no broader than reasonably necessary to prevent the decep-

tion." 455 U.S. at 203, 102 S.Ct. at 937. Of course, this court also recognizes that advertising of professional services "afford[s] opportunities to mislead and confuse that are not present when standardized products or services are offered to the public." 455 U.S. at 203, 102 S.Ct. at 938, n. 15.

■ In determining whether P.C.P. G.'s advertising is misleading or is potentially misleading, the court must focus, as did the parties in their briefs, on such words as "emergency," "immediate," "crisis," "sudden," etc. The defendants contend that the use of such words either misleads or has the potential for misleading the public into believing that a facility using such terms in its advertising treats life- or limb-threatening conditions. The defendants' position is succinctly set forth at page 30 of their brief in opposition to the plaintiffs' motion for summary judgment:

> [A]ny center need only avoid advertising for minor emergency care as defined within the regulations in order to completely avoid regulation.... It is only when the center, by offering minor emergency care and by treating minor emergency patients, brings itself into the classification of a free standing emergency care clinic that regulation applies.

This court agrees, as did the plaintiffs, that restrictions on the use of certain words, such as "emergency" are appropriate, since "emergency" suggests to the public that treatment is available for life- or limb-threatening conditions. However, this court holds that the mere use of a red cross or a red-outlined cross or the use of the word "sudden" in advertising does not mislead the public nor has the potential of misleading the public into believing that limb- or life-threatening conditions would be treated at a facility so advertising. The court further finds that even if such terms might be misinterpreted by the public, any potential for confusion on the part of the public could be alleviated by including in the advertising a disclaimer to the effect that treatment at the facility for life- or

limb-threatening conditions was not available.

With respect to the third part of the *Central Hudson* analysis, the court holds that the state does have a genuine interest in seeing that facilities offering medical services do not mislead the public with respect to the kind of services available at that facility. However, as the Supreme Court noted in *Central Hudson,* the regulations advancing that governmental interest must be no more extensive than necessary to serve that interest.

This court holds that the regulations as drawn are more extensive than necessary to serve the governmental interest of prohibiting misleading advertising. As stated above, the state may certainly regulate the use of such words as "emergency" or "crisis." However, the regulations also proscribe such terms as "sudden" and "acute." (The regulations are also impermissibly vague in providing that facilities which use such terms "or a similar meaning term" shall fall within the regulatory ambit. Such vagueness does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)).

The state's interest in seeing that the public is not misled regarding the nature and scope of services offered at FECC's may be met by requiring that all advertising carry the disclaimer that the facility is not for the treatment of life- or limb-threatening injuries. Such a restriction will be narrow enough so as not to impermissibly restrict the plaintiffs' commercial speech while at the same time insuring that the public would not be misled into believing that facilities which advertised treatment for "sudden," "acute," or "urgent" conditions have the capability of treating life- or limb-threatening injuries. At the same time, any FECC which did hold itself out as treating life- or limb-threatening injuries (either explicitly or implicitly through the use of certain words in adver-

tising without such a disclaimer as noted above) could be required to comply with the licensure requirements of the Georgia regulations.

Since the court finds that defendants' actions have violated the First Amendment rights of plaintiffs, it is unnecessary for the court to consider the other constitutional questions raised by the plaintiffs.

The court, however, also holds that the plaintiffs' complaint does not state a cause of action under 42 U.S.C. § 1983. There is no allegation that the state does not provide an adequate remedy to challenge the alleged unconstitutional deprivation of the plaintiffs' property rights. As long as the state provides an appropriate remedy for the alleged taking of property, there is no violation of Section 1983. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

For the foregoing reasons, the plaintiffs' motion for summary judgment is GRANTED, and the plaintiffs are entitled to a judgment declaring the regulations as now written to be unconstitutional and an injunction against the defendants enjoining them from enforcing the regulations as now written. The plaintiffs will submit a proposed judgment to this court within twenty days after the filing of this order, after giving the defendants an opportunity to review the same as to form.