Filed 2/10/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MERCURY CASUALTY COMPANY, | C077116, C078667 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201380001426CUWMGDS) |
| v. | |
| DAVE JONES, as Insurance Commissioner, etc., | |
| Defendant and Respondent; | |
| PERSONAL INSURANCE FEDERATION OF CALIFORNIA et al., | |
| Interveners and Appellants; | |
| CONSUMER WATCHDOG, | |
| Intervener and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge. Affirmed.

1

Hinshaw & Culbertson, Richard G. De La Mora and Spencer Y. Kook, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Diane S. Shaw, Senior Assistant Attorney, Stephen Lew, Supervising Deputy Attorney General, for Defendant and Respondent.

Hogan Lovells, Vanessa O. Wells, Victoria C. Brown, Jenny Q. Shen, Lisa K. Swartzfager, for Interveners and Appellants.

Harvey Rosenfield, Pamela M. Pressley, Jonathan Phenix; Zohar Law Firm, Daniel Y. Zohar and Todd M. Foreman, for Intervener and Respondent.

This appeal arises out of an application Mercury Casualty Co. (Mercury) filed in 2009 to increase its homeowners' insurance rates.  In denying the increase Mercury requested, the California Insurance Commissioner (the commissioner) made two decisions that are at issue on appeal.  First, the commissioner determined that under subdivision (f) of section 2644.10 of title 10 of the California Code of Regulations, which disallows, for ratemaking purposes, all "[i]nstitutional advertising expenses," Mercury's entire advertising budget had to be excluded from the calculation of the maximum permitted earned premium because "Mercury[] aims its entire advertising budget at promoting the Mercury Group as whole" rather than "seek[ing] to obtain business for a specific insurer and also provid[ing] customers with pertinent information" about that specific insurer.[1]  Second, the commissioner determined that Mercury did not qualify for

---

[1]     Section 2644.10 provides that certain expenses "shall not be allowed for ratemaking purposes."  Subdivision (f) of that section identifies "[i]nstitutional advertising expenses" as one category of disallowed expenses and defines "[i]nstitutional advertising" as "advertising not aimed at obtaining business for a specific insurer and not providing consumers with information pertinent to the decision whether to buy the insurer's product."

We will refer to this regulation as section 2644.10(f); other undesignated section references are also to title 10 of the California Code of Regulations.

2

a variance from the maximum permitted earned premium under subdivision (f)(9) of section 2644.27 because "Mercury failed to demonstrate the rate decrease [that resulted from application of the regulatory formula] results in deep financial hardship."[2]

Mercury and certain insurance trade organizations referred to collectively as the Trades[3] unsuccessfully sought to challenge the commissioner's decision in the superior court. On appeal from the superior court's judgment against them, Mercury and the Trades raise three main issues. First, Mercury and the Trades contend the commissioner and the superior court erred in interpreting and applying section 2644.10(f) with regard to what constitutes institutional advertising expenses. Second, the Trades contend section 2644.10(f) violates the First Amendment to the United States Constitution because the regulation imposes a content-based financial penalty on speech. Third, Mercury and the Trades contend the commissioner and the superior court erred in determining that Mercury did not qualify for the constitutional variance because the commissioner and the court wrongfully applied a "deep financial hardship" standard instead of a "fair return" standard.

---

[2]    Subdivision (f)(9) of section 2644.27 provides that one valid basis for requesting a variance is "[t]hat the maximum permitted earned premium would be confiscatory as applied. This is the constitutionally mandated variance articulated in 20th Century v. Garamendi (1994) 8 Cal.4th 216 which is an end result test applied to the enterprise as a whole."

We will refer to this regulation as section 2644.27(f)(9) and to the variance described therein as the constitutional variance or the confiscation variance.

[3]    The Trades consist of the following organizations: Personal Insurance Federation of California, American Insurance Association, Property Casualty Insurers Association of America dba Association of California Insurance Companies, National Association of Mutual Insurance Companies, and Pacific Association of Domestic Insurance Companies.

Finding no merit in these arguments, or any of the other arguments offered to overturn the judgment, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We begin with some brief background on the area of the law involved here. "At the November 8, 1988, General Election, the voters approved an initiative statute that was designated on the ballot as Proposition 103. The measure made numerous fundamental changes in the regulation of automobile and other forms of insurance in California. Formerly, the so-called 'open competition' system of regulation had obtained, under which 'rates [were] set by insurers without prior or subsequent approval by the Insurance Commissioner . . . .' [Citation.] Under that system, 'California ha[d] less regulation of insurance than any other state, and in California automobile liability insurance [was] less regulated than most other forms of insurance.' [Citation.] The initiative contained, among others, provisions relating to the rollback of rates for insurance within its coverage for the period extending from November 8, 1988, through November 7, 1989. (For purposes here, a rate is the price or premium that an insurer charges its insureds for insurance.)" (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 239-240 (*20th Century*).) "For the period extending from November 8, 1988, through November 7, 1989 (hereafter sometimes the rollback year or simply 1989), as a temporary regulatory regime of rate reduction and freeze evidently designed to allow the setting up of a permanent regulatory regime to follow, Proposition 103 itself sets a maximum rate for covered insurance at 80 percent of the rate for the same insurance in effect on November 8, 1987 (hereafter sometimes the 1987 rate). [¶] For the period extending from November 8, 1989, into the future, Proposition 103 institutes a permanent regulatory regime comprising the 'prior approval' system, under which, in the words of Insurance Code section 1861.05, subdivision (a), the Insurance Commissioner must approve a rate applied for by an insurer before its use, looking to whether the rate in question is 'excessive, inadequate, unfairly discriminatory or otherwise in violation of'

4

specified law -- considering the 'investment income' of the individual insurer and *not considering* the 'degree of competition' in the insurance industry generally." (*20th Century*, at p. 243.)

"In *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] (hereafter sometimes *Calfarm*), [the Supreme Court] upheld, inter alia, Proposition 103's provision requiring rate rollbacks." (*20th Century*, *supra*, 8 Cal.4th at p. 240.) The court "reviewed Proposition 103 against challenges under the United States and California Constitutions, including a claim that the rate rollback requirement provision was on its face invalid as confiscatory and arbitrary, discriminatory, or demonstrably irrelevant to legitimate policy in violation of the takings clause of the Fifth Amendment and article I, section 19 and the due process clause of the Fourteenth Amendment and article I, sections 7 and 15. In the course of [the court's] analysis, [the court] rejected the point." (*20th Century*, at pp. 243-244, fn. omitted.)

Five years after *Calfarm*, in *20th Century*, the Supreme Court "review[ed] the implementation of Proposition 103's rate rollback requirement provision by the Insurance Commissioner." (*20th Century*, *supra*, 8 Cal.4th at p. 240.) The court ultimately upheld the commissioner's actions. (*Id.* at p. 329.)

With that background in mind, we turn to the facts of the present case. In May 2009, Mercury filed an application with the Department of Insurance to increase its rates on its homeowner's multi-peril line of insurance, which consists of policy form HO-3 (residential homeowners' insurance), policy form HO-4 (renters and tenants insurance), and policy form HO-6 (insurance for condominium owners). Originally, Mercury sought an overall rate increase of 3.9 percent. As the administrative proceeding regarding Mercury's application continued, however, Mercury filed updated applications, so that Mercury ultimately sought an overall rate increase of either 8.8 percent or 6.9 percent. (The reason for the difference is not material here.)

In June 2009, Consumer Watchdog submitted a petition to intervene in the proceeding, combined with a petition for a hearing on Mercury's application. The commissioner granted the petition to intervene in July 2009 but deferred ruling on the petition for a hearing until two years later, when, in May 2011, the commissioner issued a notice of hearing on his own motion and on Consumer Watchdog's petition.

In October 2011, Mercury submitted the prefiled direct testimony of various witnesses, including Robert S. Hamada and David Appel. As a financial economist, Hamada was asked "to provide an economic application of th[e] variance . . . in [section 2644.27(f)(9)], and to determine whether the maximum permitted return is quantitatively 'confiscatory' to the providers of Mercury's capital." Hamada asserted that "[t]o do this, it is necessary to lay out an economic interpretation of 'fair' return to use as a benchmark to quantify whether a statutorily-determined return is 'confiscatory.' " For his part, Dr. Appel was also asked to opine (among other things) whether it was appropriate for Mercury to seek a variance under section 2644.27(f)(9).

The commissioner and Consumer Watchdog filed motions to strike some of Mercury's prefiled direct testimony, including the testimony of Hamada and some of the testimony of Appel. In ruling on those motions, the administrative law judge (ALJ) explained that to qualify for the variance under section 2644.27(f)(9), Mercury had to "demonstrate [that] the maximum earned premium under the ratemaking formula results in an inability to operate successfully. Put differently Mercury is permitted to show the maximum rate will cause deep financial hardship to Mercury's enterprise as whole." Finding that neither Hamada nor Appel "provide[d] evidence that the regulatory rate, as applied to Mercury, prevents Mercury from operating successfully," the ALJ struck Hamada's "statements pertaining to confiscation" and those portions of Appel's testimony contending that the "regulatory rate of return is confiscatory." The ALJ later made similar rulings as Mercury tried several more times to offer testimony from Hamada and Appel concerning "fair return."

6

In its posthearing brief, Consumer Watchdog argued that all of Mercury's advertising expenses should be excluded from the rate calculation as institutional advertising expenses because the evidence showed that none of Mercury's advertising in California was aimed at obtaining business for a particular insurer; instead, "Mercury's ads and campaigns promote a fictional entity called 'Mercury Insurance Group.' "

For its part, Mercury argued that under the language of section 2644.10(f), "advertising is not 'institutional advertising' if it is aimed at obtaining business for an insurer or it provides consumers with information pertinent to the decision whether to buy the insurer's product." Mercury further argued that "Mercury's advertisements are all aimed at obtaining business for Mercury or its affiliate insurance companies and providing information to consumers on why they should buy a Mercury product."

In its posthearing brief, the Department of Insurance argued that under *20th Century*, "[c]onfiscation occurs when proposed regulatory action would impose deep financial hardship on the regulated entity." The department further argued that its "rate proposal, far from convincingly demonstrating deep financial hardship and an inability to operate successfully, would allow Mercury to successfully operate in California" because "[a]ccording to Mercury's own calculations, the [department's] proposal would result in $3,670,645 of expected operating profit" -- a " 'total return of less than 5%' " -- and such a return "would not constitute deep financial hardship."

For its part, Mercury argued that under *20th Century*, "in deciding whether rates produced by the formula are 'confiscatory,' courts are required to determine if they would deny an insurer the opportunity to earn a 'just, reasonable and fair return.' "

In January 2013, the ALJ submitted her proposed decision, which the commissioner adopted in full in February 2013. As relevant here, the commissioner found that "Mercury General Corporation is the parent company for Mercury Casualty and 21 other entities. Mercury General provides no services to customers and receives all its operating resources directly from its insurance affiliates, most notably Mercury

Casualty." "In 2008, 2009 and 2010 Mercury General Corporation's advertising expenses totaled $26 million, $27 million, and $30 million respectively." "Mercury General and all its affiliates advertise under the name 'Mercury Insurance Group,' " and "Mercury does not allocate advertising expenditures to specific insurance affiliates nor does the advertising department distinguish between insurance entities when generating advertising campaigns." Based on these findings, the commissioner determined that under section 2644.10(f), "Mercury's entire advertising budget must be excluded from the rate application" because "Mercury[] aims its entire advertising budget at promoting the Mercury Group as whole" rather than "seek[ing] to obtain business for a specific insurer and also provid[ing] customers with pertinent information" about that specific insurer. The commissioner also determined that Mercury did not qualify for the constitutional variance under section 2644.27(f)(9) because "Mercury failed to demonstrate the rate decrease results in deep financial hardship." Based on these (and other) determinations, the commissioner denied Mercury's application for an overall rate increase of 8.8 percent and instead approved an 8.18 percent rate decrease for policy form HO-3, a 4.32 percent rate increase for policy form HO-4, and a 29.44 percent rate increase for policy form HO-6.

In March 2013, Mercury filed a petition for writ of mandate and complaint for declaratory relief in the superior court seeking review of the commissioner's decision. Consumer Watchdog and the Trades successfully petitioned for leave to intervene.

In June 2014, the superior court issued its ruling denying Mercury's writ petition. As relevant here, the court rejected Mercury's argument that the commissioner "applied the wrong standard to assess whether Mercury could show confiscation to entitle Mercury to a variance." Disagreeing with Mercury that the commissioner "should have assessed whether Mercury could earn a 'fair rate of return' under the rate order," the court instead agreed with the commissioner "that the test for confiscation is 'deep financial hardship' " and "Mercury did not demonstrate 'deep financial hardship' to support its request for a

8

confiscation variance." The court also rejected Mercury's argument that the commissioner "misinterpreted the regulation defining 'institutional advertising.' "

In August 2014, Mercury appealed from the superior court's June ruling denying its writ petition, even though judgment had not yet been entered. In January 2015, the court issued a formal order denying Mercury's writ petition and dismissing Mercury's complaint for declaratory relief. The court also denied or dismissed all of the causes of action in the Trades' complaint in intervention. In doing so, the court addressed and rejected the Trades' argument that section 2644.10(f) violates the First Amendment.

In February 2015, the court entered judgment against Mercury and the Trades. Mercury and the Trades timely appealed from that judgment.

DISCUSSION

I

*Section 2644.10(f) -- Institutional Advertising*

Section 2644.10(f) provides that "[i]nstitutional advertising expenses" "shall not be allowed for ratemaking purposes" and that " '[i]nstitutional advertising' means advertising not aimed at obtaining business for a specific insurer and not providing consumers with information pertinent to the decision whether to buy the insurer's product."

In disallowing all of Mercury's advertising expenses as institutional advertising expenses, the commissioner explained that "institutional advertising is image advertising which strives to enhance a company's reputation or improve corporate name recognition. Such advertising does not promote a specific product or service but instead attempts to obtain favorable attention to the company as whole." (Fns. omitted.) The commissioner then made the following findings regarding Mercury's advertising: "Mercury General and all its affiliates advertise under the name 'Mercury Insurance Group.' The Mercury Insurance Group is not a legal entity in any state and not a licensed insurer in California. Mercury General's advertising department supports all of Mercury's affiliates and

9

Mercury guides all its prospective customers to one telephone number. Mercury does not allocate advertising expenditures to specific insurance affiliates nor does the advertising department distinguish between insurance entities when generating advertising campaigns. All Mercury companies share a common website which identifies the company as Mercury Insurance Group." (Fns. omitted.)

The commissioner concluded that section 2644.10(f) "permits [in the context of ratemaking] only [expenses for] advertising that seeks to obtain business for a specific insurer and also provides customers with pertinent information. As Mercury[] aims its entire advertising budget at promoting the Mercury Group as a whole, . . . Mercury's entire advertising expenditures must be removed from the ratemaking formula."

The superior court concluded that the commissioner's interpretation of section 2644.10(f) was "reasonable and consistent with Proposition 103's goals of consumer protection." "Thus, if Mercury wished to include its advertising expenses in the ratemaking calculation, it was required to show that (1) its advertising was aimed at obtaining business for a specific insurer *and* (2) provided consumers with information pertinent to the decision whether to buy the insurer's product." The court further concluded that the commissioner "properly concluded that Mercury's advertising was not directed at a 'specific insurer' " and for that reason the commissioner correctly excluded all of Mercury's advertising expenses from the rate calculation.

A

*Mercury's Arguments On Appeal*

On appeal, Mercury contends the commissioner erred in disallowing all of Mercury's advertising expenses because the commissioner erroneously held that advertising qualifies as institutional advertising if *either* of the two criteria in section 2644.10(f) is met, when the regulation requires that *both* criteria be met. According to Mercury, "[t]he [c]ommissioner . . . improperly substituted the word 'or' for the word 'and' in the regulation."

10

We find no merit in this argument because section 2644.10(f) does not set forth two criteria that are to be separately analyzed and applied. Instead, the regulation sets forth a singular, unified definition of what constitutes "[i]nstitutional advertising." Specifically, advertising is institutional if it is not aimed at obtaining business for a specific insurer and does not provide consumers with information pertinent to the decision whether to buy that insurer's product.

Here, the commissioner concluded that all of Mercury's advertising qualified as institutional advertising within the meaning of section 2644.10(f) because Mercury aims its entire advertising budget at promoting the Mercury Insurance Group as a whole and the Mercury Insurance Group is not a specific insurer. If the commissioner was correct in his characterization of Mercury Insurance Group (which we address below), then the commissioner was also correct in his conclusion that all of Mercury's advertising qualifies as institutional advertising within the meaning of section 2644.10(f) because advertising that is aimed entirely at promoting an entity that is *not* a specific insurer is advertising that is not aimed at obtaining business for a specific insurer and does not provide consumers with information pertinent to the decision whether to buy that insurer's product.

That brings us to Mercury's argument that the commissioner erred in concluding that Mercury's advertising was not aimed at obtaining business for a specific insurer because "all of Mercury's advertising was conducted under the name trade name 'Mercury' rather than the technical corporate name 'Mercury Casualty Company.'" Mercury contends the commissioner was wrong in this regard "for several reasons." Before addressing those reasons, however, we pause to more fully set forth the commissioner's exact ruling on this subject.

Contrary to Mercury's argument, the commissioner did not conclude that Mercury's advertising was not aimed at obtaining business for a specific insurer because all of that advertising was conducted under the trade name "Mercury" rather than the

11

technical corporate name "Mercury Casualty Company." Instead, the commissioner's ruling was far more comprehensive and nuanced than Mercury's argument acknowledges. First, the commissioner found, by a preponderance of the evidence, "the following facts with regard to Mercury's advertising expenditures and methods":

"Mercury General and all its affiliates advertise under the name 'Mercury Insurance Group.'[4] The Mercury Insurance Group is not a legal entity in any state and not a licensed insurer in California. Mercury General's advertising department supports all of Mercury's affiliates and Mercury guides all its prospective customers to one telephone number. Mercury does not allocate advertising expenditures to specific insurance affiliates nor does the advertising department distinguish between insurance entities when generating advertising campaigns. All Mercury companies share a common website which identifies the company as Mercury Insurance Group.

"In 2008, 2009 and 2010, Mercury General Corporation's advertising expenses totaled $26 million, $27 million and $30 million respectively. Mercury allocates its advertising budget among a variety of media, including television, radio, direct mail and sports sponsorship. Mercury's Annual Report states the company 'believes that its advertising program is important to create brand awareness and to remain competitive in the current insurance climate.' " (Fns. omitted.)

Based on these findings, the commissioner reached the following conclusions:

"Mercury defines institutional advertising as advertising that is not designed to generate business or provide customers with information. This definition of institutional advertising is both narrow and impracticable, and would render all advertising expenses chargeable to the ratepayer; a fact Mercury concedes. Instead, the Regulation permits only advertising that seeks to obtain business for a specific insurer and also provides

---

**4** Elsewhere, the commissioner found that "Mercury General Corporation is the parent company for Mercury Casualty and 21 other entities."

customers with pertinent information.  As Mercury[] aims its entire advertising budget at promoting the Mercury Group as a whole, the [commissioner] concludes that Mercury's entire advertising expenditures must be removed from the ratemaking formula.

"[¶] . . . [¶]

"Mercury admits its advertising does not seek to obtain business for a specific insurer.  In fact, Mr. Thompson acknowledges that all of Mercury's advertising is designed for the insurance group and <u>not</u> for a specific affiliate or company within Mercury.  This fact is further confirmed when analyzing Mercury's advertisements.  Both print and radio advertisements urge consumers to contact the 'Mercury Insurance Group' through a common website and telephone number.  Consumers do not contact the specific insurance affiliates directly, nor do any of Mercury's specific insurers engage in their own advertising.  While Mr. Thompson argues the advertising is 'insurance' specific, the Regulation requires the promotion be aimed at generating business for a specific insurer, not a specific industry

"[¶] . . . [¶]

"Nor can Mercury argue that the 'Mercury Insurance Group' is a specific insurer.  The Mercury Insurance Group is not a legal entity, nor is there any consensus as to the makeup of the Mercury Insurance Group.  Mr. Thompson testified the Mercury Insurance Group is comprised of Mercury Casualty, Mercury Insurance Company, and California Automobile.  But Mr. Yeager testified the Mercury Insurance Group includes all 22 legal entities that make up the consolidated Mercury General Corporation.  What is certain is that Mercury General does not advertise for its specific insurers and instead engages in advertising on behalf of the organization as a whole.

"[¶] . . . [¶]

"Mercury urges the Commissioner to interpret 'specific insurer' to mean 'a specific group of affiliated insurers.'  Yet such an interpretation is contrary to the clear regulatory intent and inconsistent with the purpose of [the] provision.

13

"The rules governing statutory interpretation also apply to the Commissioner's Regulations. The first rule in statutory construction requires the interpreter to examine the regulation's language. If the regulation's words, given their usual and ordinary meaning and read in context, are clear and unambiguous, the conclusion must be that the adopting authority meant what it said, and the plain meaning of the regulation applies.

"Regulation 2644.10, subdivision (f) contains clear and unambiguous language. The Regulation defines institutional advertising as advertising not aimed at obtaining business for a specific insurer. Had the Commissioner intended to charge consumers for affiliate or group advertising, he could have eliminated the reference to 'a specific' insurer. But the Commissioner['s] decision to include the 'specific insurer' requirement renders the Regulation's meaning unmistakable. Advertising which generates business for a group of insurance companies, regardless of affiliation, is not advertising for a specific insurer.

"Mercury also argues the Regulation is arbitrary. Mercury contends there is no logical reason to penalize an insurer for advertising under a group insurance name. But such an argument is defeated when one considers the Regulation's intent. Consumers are obligated to pay only expenses necessary in the offering of an insurance product or that in some way provide them benefit. Mercury may not charge consumers for advertising that promotes corporate identity, enhances public opinion, or increases name and brand awareness. Mercury chose to direct its advertising budget towards its entire group of affiliates. In so doing, Mercury does not distinguish between those expenses chargeable to Mercury Casualty customers and those chargeable to affiliated ratepayers. As such, Mercury cannot require its Mercury Casualty policyholders to fund its advertising for other Mercury companies. In addition, Mercury does not explain why Mercury Casualty policyholders, as opposed to shareholders, should shoulder the expense of advertising for Mercury General since that does not benefit them in any fairly discernible and direct way.

14

This failure means Mercury's entire advertising budget must be excluded from the rate application." (Fns. omitted.)

With this more complete understanding of the commissioner's ruling, we turn back to Mercury's arguments. Eschewing even any pretense of arguing about the meaning of the term "specific insurer" in light of the various well-known rules of statutory construction, Mercury offers four ad hoc reasons why the commissioner's determination that the term "specific insurer" does not embrace " 'a specific group of affiliated insurers' " should be deemed "wrong." First, Mercury contends the commissioner's ruling "unreasonably forces insurers to advertise under their technical corporate names" because it "would generate confusion as consumers shop for coverage among insurers known to them by trade names such as Farmers, State Farm, and Allstate and not by obscure technical corporate names." Second, Mercury contends "the Commissioner's interpretation does not allow an insurance company, such as Mercury, to take into account its allocated share of expenses incurred for advertising that solicits business for affiliated insurers operating as part of a single insurance holding company system," and "[s]uch a result would be absurd and contrary to the Regulations, which in numerous places -- including the consideration of 'excluded expenses' such as 'institutional advertising' -- require the assessment of data at the group level." Third, Mercury contends "the 'technical corporate name only' interpretation will lead to results that are contrary to one of the primary goals of the prior approval laws -- to ensure that rates are not excessive. [Citation.] To achieve this goal the prior approval laws should be construed to encourage, not penalize, cost-effective business practices such as trade name advertising." Fourth, Mercury contends that "recognizing the cost of 'trade name advertising' in the formula would be consistent with those provisions of Proposition 103 that require the consideration of insurer groups as a single insurer for marketing, underwriting, and rating purposes."

15

In our view, none of Mercury's arguments on this point is cognizable with respect to how the term "specific insurer" should be interpreted under the various well-known canons of statutory interpretation. Instead, Mercury's arguments are really directed at why the regulation never should have included the term "specific insurer" in the first place. In other words, these are *policy* arguments that should have been (and, indeed, may have been) directed at the commissioner when he promulgated section 2644.10(f) in the first place. But we are not a legislative or quasi-legislative body, and it is not within our power to decide what terms the regulation *should* have included. We can only interpret what is already there, and inasmuch as Mercury's arguments on this point are not addressed to any interpretation that reasonably could be affixed to the existing term, "specific insurer," we have no cause to consider those arguments further.

Finally, Mercury contends that "[b]ecause the [c]ommissioner . . . erroneously construed section 2644.10(f) in the disjunctive and then found that Mercury's trade name advertising did not meet the 'specific insurer' requirement," the commissioner did not consider or weigh "the evidence to determine if Mercury's ads met the 'pertinent information' requirement" of the second criterion in the regulation. This argument need not detain us long. We have concluded already that section 2644.10(f) does not set forth two criteria that are to be separately analyzed and applied. Instead, the regulation sets forth a singular, unified definition of what qualifies as "[i]nstitutional advertising." Having found that Mercury aims its entire advertising budget at promoting the Mercury Insurance Group as a whole and having concluded that the Mercury Insurance Group is not a specific insurer within the meaning of section 2644.10(f), the commissioner properly excluded all of Mercury's advertising expenses from the rate calculation pursuant to the regulation because Mercury's advertising was not aimed at obtaining business for a specific insurer and did not provide consumers with information pertinent to the decision whether to buy that insurer's product. Accordingly, all of Mercury's

16

challenges to the commissioner's rulings with respect to Mercury's advertising expenses are without merit.

B

*The Trades' Arguments On Appeal*

For their part, the Trades contend the commissioner's interpretation of section 2644.10(f), "endorsed by the trial court -- is inconsistent with the language of the regulation, and is incorrect." The Trades also contend that the exclusion of institutional advertising expenses from the rate formula violates the First Amendment by imposing a content-based penalty on speech. We address these arguments in turn.

1.      *Interpretation Of Section 2644.10(f)*

To fully understand the Trades' argument that the commissioner and the superior court erred in interpreting section 2644.10(f) , further explanation of the regulatory scheme, and the superior court's decision, is required.

Expenses that are excluded from the rate calculation, including institutional advertising expenses, are entered on pages 13a and 13b of the rate application. These pages provide for calculation of a three-year average "[e]xcluded [e]xpense [f]actor," which is a percentage determined by dividing total excluded expenses by direct earned premiums. For example, Mercury's updated application showed a 0.20 percent excluded expense factor for 2008, which resulted from dividing total excluded expenses of $5,703,498 by direct earned premiums of $2,808,839,000.

Section 2644.10 -- the regulation governing excluded expenses -- provides that the excluded expense factor is "the ratio of the insurer's *national* excluded expenses to its *national* direct earned premium." (§ 2644.10, italics added.) Consistent with this, the application calls for the use of "[c]ountrywide direct earned premium" and "[c]ountrywide" institutional advertising expenses in calculating the excluded expense factor.

In framing the issue regarding the commissioner's interpretation of section 2644.10(f), the superior court stated that "[t]he dispute is whether the term 'specific insurer' means only the rate applicant (in this case, Mercury Casualty Company) or whether it encompasses advertising on behalf of a group of affiliated entities, which are not rate applicants." The court then concluded as follows: "The Commissioner's interpretation of the regulation's term 'specific insurer' was reasonable. The advertising did not relate specifically to Mercury Casualty Company, the rate applicant. Rather it related a large group of affiliates, that were not applying for a rate reduction, and that may or may not do business in the state. Accordingly, the Commissioner's interpretation protects consumers from underwriting advertising expenses of other entities that may not operate in California, and were not applying for the rate adjustment."

Construing the superior court's conclusion to be that the term "specific insurer" in section 2644.10(f) "means the applicant," the Trades argue that "[t]his construction [of the regulation] is not acceptable" because it "does not match what is calculated as the excluded expense factor." Noting that the regulation calls for *nationwide*, or "groupwide," data to calculate the excluded expense factor, the Trades argue that "[i]f all advertising for other group affiliates is counted as an excluded expense in the numerator, the numerator and denominator do not contain like data." In other words, the Trades posit that under the superior court's construction of the regulation, the denominator will consist of the national direct earned premium from all insurers within the group but the numerator will consist of all advertising expenses except those relating to the applicant, including advertising expenses related to "specific insurers" other than the applicant. The Trades contend that "the result of such a mismatch is not a proper allocation to a California line of insurance of its proper share of countrywide group expense."

The commissioner responds that "advertising for specific affiliates [other than the applicant] is *not* excluded under [section] 2644.10[(f)]." "Advertising for a specific affiliate -- any affiliate -- is not considered institutional and therefore any such expenses

18

are not excluded. So long as the advertising is targeted to a specific insurer, it does not matter what affiliate it is for." Moreover, the commissioner points out that "there [wa]s no evidence that any advertising expenses for any specific insurer were excluded" here.

This last point is dispositive of the Trades' argument. The commissioner specifically found that "Mercury[] aims its entire advertising budget at promoting the Mercury Group as a whole" and that "Mercury General does not advertise for its specific insurers and instead engages in advertising on behalf of the organization as a whole." The Trades point to no evidence to the contrary. Accordingly, it is apparent that here the numerator in the calculation of the excluded expense factor contained *no* expenses for advertising that related to *any* "specific insurer," whether the applicant (Mercury Casualty Company) or any other affiliate within the insurance group. Thus, the Trades' argument that the numerator and denominator did "not contain like data" is without merit.

The Trades next argue that the commissioner's interpretation of section 2644.10(f) "is inconsistent with the reality of consumer perception" because "[i]f an advertisement makes a point about homeowner's insurance, and says 'Mercury', it is an advertisement 'aimed at obtaining business for [the] specific insurer' writing Mercury homeowner's insurance." Even if this were true, however, the Trades point to no evidence that Mercury's excluded advertising expenses included expenses for any such advertisement. Accordingly, the Trades have failed to fully develop this argument, and we need not consider it further.

The Trades also argue that "an advertisement may be 'aimed at obtaining business' for more than one affiliated 'specific insurer[]'." This argument goes nowhere because the commissioner found that Mercury's advertising was not aimed at obtaining business for *any* specific insurer, and the Trades point to no evidence to the contrary.

In summary, none of the Trades' attacks on the commissioner's interpretation and application of section 2644.10(f) has any merit.

19

2.    *First Amendment Challenge To Section 2644.10(f)*

The Trades contend that because expenses for advertising that is deemed "institutional" are excluded from the rate formula, thereby reducing the "permitted earned premium," and because the determination of whether advertising qualifies as "institutional" is based on the content of the advertisements, the institutional advertising regulation amounts to a constitutionally impermissible content-based penalty on speech. We are not persuaded.

At the outset, we reject the argument by the commissioner and Consumer Watchdog that section 2644.10(f) does not implicate the First Amendment. For his part, the commissioner asserts that the regulation "does not in any way ban speech or compel specific content." This may be so, but that does not mean the regulation is immune from scrutiny under the First Amendment. The United States Supreme Court "has recognized . . . that the 'Government's content-based burdens [on speech] must satisfy the same rigorous scrutiny as its content-based bans.' " (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 565-566 [180 L.Ed.2d 544, 556].) "Imposing a financial burden on a speaker based on the content of the speaker's expression is a content-based restriction of expression and must be analyzed as such." (*Pitt News v. Pappert* (3d Cir. 2004) 379 F.3d 96, 106.) Thus, if section 2644.10(f) imposes a content-based burden on Mercury's speech, it does not matter that the regulation does not ban speech or compel specific content; it is nonetheless subject to First Amendment scrutiny.

For its part, Consumer Watchdog contends section 2644.10(f) does not place any financial burden on speech, but we disagree. Here, the regulation burdened Mercury financially because its effect was to exclude all of Mercury's advertising expenses from the rate formula, which necessarily resulted in a lesser maximum premium rate than Mercury would have been allowed if its advertising expenses had been included in the formula. As Mercury points out, "[i]f advertising expense is excluded from the dollars permitted in the rate, there is no revenue source from which it can be paid. The insurer

20

can either pay for such advertising out of profit, or stop the advertising." Thus, assuming two otherwise identically situated insurers, one of which engaged solely in institutional advertising and the other of which engaged solely in noninstitutional advertising, the advertiser that engaged only in noninstitutional advertising would reap a greater profit because of section 2644.10(f) than the advertiser that engaged only in institutional advertising. For this reason, as the Trades contend, "the regulation burdens . . . speech" based on the content of that speech and thus implicates the First Amendment.

The next question is whether section 2644.10(f) encompasses only commercial speech or whether, as the Trades argue, it encompasses both commercial and noncommercial speech. This matters because different levels of scrutiny are implicated depending on whether commercial or noncommercial speech is involved. " '[T]he [federal] Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.' [Citation.] [¶] For noncommercial speech entitled to full First Amendment protection, a content-based regulation is valid under the First Amendment only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest. . . . [¶] 'By contrast, regulation of commercial speech based on content is less problematic.' [Citation.] To determine the validity of a content-based regulation of commercial speech, the United States Supreme Court has articulated an intermediate-scrutiny test." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952.)

We reject the argument by the commissioner and Consumer Watchdog that the speech to which section 2644.10(f) applies qualifies as commercial speech simply because the regulation pertains to "advertising." In *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60 [77 L.Ed.2d 469], the United States Supreme Court held that even though certain pamphlets "were conceded to be advertisements, that fact alone did not make them commercial speech because paid advertisements are sometimes used to convey political or other messages unconnected to a product or service or commercial

21

transaction." (*Kasky v. Nike, Inc.*, *supra*, 27 Cal.4th at p. 956, citing *Bolger*, at p. 66 [77 L.Ed.2d at p. 477].) The *Bolger* court "identified three factors -- advertising format, product references, and commercial motivation -- that in combination supported a characterization of commercial speech in that case," but the court also "rejected the notion that any of these factors is *sufficient* by itself" to support such a characterization and "also declined to hold that all of these factors in combination, or any one of them individually, is *necessary* to support a commercial speech characterization." (*Kasky*, at p. 957.)

Here, as the Trades argue, section 2644.10(f) primarily singles out advertising that may qualify as *noncommercial* speech for the excluded expense penalty. As we have explained, under the regulation an insurer cannot pass on to the consumer the cost of advertising that is *not* aimed at obtaining business for a specific insurer and/or that does *not* provide consumers with information pertinent to the decision whether to buy that specific insurer's product. Thus, the less commercial the speech is, the more likely it is to fall within the exclusion of section 2644.10(f). It is at least possible that an insurer might engage in advertising that would, at least in some part, be deemed noncommercial speech for First Amendment purposes. Thus, as the Trades contend, section 2644.10(f) may sweep within its ambit both commercial and noncommercial speech. For this reason, the regulation is subject to strict scrutiny. (See *Dex Media West, Inc. v. City of Seattle* (9th Cir. 2012) 696 F.3d 952, 953, 954 [holding that an ordinance that imposed "substantial conditions and costs on the distribution of yellow pages phone directories" was subject to strict scrutiny because, "[a]lthough portions of the directories are obviously commercial in nature, the books contain more than that"].)

We conclude that section 2644.10(f) survives that scrutiny. Under strict scrutiny, " the regulation [must] be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest." (*Kasky v. Nike, Inc.*, *supra*, 27 Cal.4th at p. 952.) In arguing that the regulation would not survive even the intermediate scrutiny

22

that applies to commercial speech, the Trades admit that the regulation serves a "legitimate governmental purpose." We have no problem going further and concluding that the regulation promotes a compelling governmental interest. As Consumer Watchdog characterizes it, it is the "interest in prohibiting excessive [insurance] rates . . . by making sure 'that only "the reasonable costs of providing insurance" [are] included in the rates.' " More precisely, the regulation promotes the compelling government interest in ensuring that insurers like Mercury pass on to consumers through their insurance premiums only expenses for advertising that directly benefits consumers by providing them with information pertinent to the consumers' decision whether to buy a specific insurer's product. We further conclude that section 2644.10(f) is narrowly tailored to serve that purpose. The regulation does not *ban* insurers like Mercury from engaging in advertising that does not directly benefit consumers: that is, advertising that is not aimed at obtaining business for a specific insurer and does not provide consumers with information pertinent to the decision whether to buy the specific insurer's product. Instead, the regulation simply prohibits the insurer from passing the cost of such advertisements on to the consumer. That is, in fact, the least restrictive means available to promote the specific interest at issue. Thus, the regulation is narrowly tailored to promote the compelling government interest the regulation serves.

For the foregoing reasons, the Trades' constitutional challenge to section 2644.10(f) is without merit.

## II

### *Section 2644.27(f)(9) -- The Constitutional Variance*

Section 2644.27(f)(9) provides that one valid basis for requesting a variance from the maximum rate obtained by applying the regulatory formula is "[t]hat the maximum permitted earned premium would be confiscatory as applied. This is the constitutionally mandated variance articulated in 20th Century v. Garamendi (1994) 8 Cal.4th 216 which is an end result test applied to the enterprise as a whole." The commissioner determined

23

that Mercury did not qualify for the constitutional variance under section 2644.27(f)(9) because "Mercury failed to demonstrate the rate decrease results in deep financial hardship." The superior court agreed with the commissioner "that the test for confiscation is 'deep financial hardship' " and "Mercury did not demonstrate 'deep financial hardship' to support its request for a confiscation variance."

On appeal, Mercury and the Trades assert various errors in this aspect of the commissioner's and superior court's rulings. First, Mercury asserts that the commissioner and superior court erred in holding that rates are constitutionally confiscatory only if they result in financial distress, rather than simply in the inability to earn a fair return. The Trades make a similar argument. Second, Mercury asserts that the commissioner and the superior court erred in determining that "the relevant enterprise" "in assessing confiscation" "was not Mercury's homeowners' insurance line, but Mercury as a whole." Again, the Trades make a similar argument. Mercury and the Trades also make some other arguments we will identify more fully below. And the Trades argue that the superior court applied the wrong standard of review in addressing the constitutional variance.

The last argument by the Trades can be disposed of briefly. Inasmuch as section 2644.27(f)(9) expressly incorporates principles of constitutional law, and because "where the action of an administrative agency infringes constitutionally granted rights, independent judicial review must be invoked" (*Kerrigan v. Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 51), it does not matter for our purposes whether, as the Trades argue, the superior court improperly deferred to the commissioner in construing and applying section 2644.27(f)(9). Engaging in our own independent judicial review, as we must, we will not defer to either the commissioner or the superior court. Thus, any error the superior court might have made in this regard was necessarily harmless.

With that out of the way, we turn to the remaining arguments presented on the constitutional variance in section 2644.27(f)(9).

24

A

*Deep Financial Hardship Versus Fair Return*

Because section 2644.27(f)(9) expressly refers to *20th Century*, it is appropriate to begin there. As we have noted, in *20th Century* the California Supreme Court "review[ed] the implementation of Proposition 103's rate rollback requirement provisions by the Insurance Commissioner." (*20th Century*, *supra*, 8 Cal.4th at p. 240.) As relevant here, the superior court had "determined that the rate regulations as to rollbacks [we]re invalid on their face with respect to the ratemaking formula" (*id.* at p. 282) because, among other things, the ratemaking formula the commissioner adopted "preclude[d] a return covering the insurer's cost of service plus 10 percent of its capital base," and "through such preclusion, the formula [wa]s . . . confiscatory" (*id.* at p. 288). In support of this latter conclusion, the superior court also determined that "confiscation does not require 'deep financial hardship' within the meaning of *Jersey Central [Power & Light Co. v. F.E.R.C.* (D.C. Cir. 1987) 810 F.2d 1168]." (*20th Century*, at p. 288)

The Supreme Court concluded that "[i]n this regard . . . , the superior court's conclusion is substantially erroneous." (*20th Century*, *supra*, 8 Cal.4th at p. 288.) In determining "the ratemaking formula . . . [wa]s . . . not confiscatory," the high court began by noting that it "would do well to rehearse, and elaborate on, the principles set out in *Calfarm*." (*20th Century Ins. Co.*, at p. 291.) The court then explained as follows:[5]

"The crucial question under the takings clause is whether the rate set is just and reasonable. [Citation.] If it is not just and reasonable, it is confiscatory. [Citation.] If it is confiscatory, it is invalid. [Citation.] '[I]t is the result reached not the method

---

[5] We set forth the Supreme Court's discussion from *20th Century* at length because, as will become apparent hereafter, that discussion directly answers the arguments by Mercury and the Trades on what standard applies in determining whether a rate is constitutionally confiscatory.

25

employed which is controlling.' [Citations.] The method may of course be traditional, and may involve case-by-case ratemaking using data reflecting the condition and performance of the regulated firm as an individual entity. But it may also be novel [citation.], and may implicate formulaic ratemaking [citation] using data reflecting the condition and performance of a group of regulated firms [citations]. It is not subject to piecemeal examination: 'The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties.' [Citation.] And, of course, courts are not equipped to carry out such a task. [Citations.] '[S]o long as rates as a whole afford [the regulated firm] just compensation for [its] over-all services to the public,' they are not confiscatory. [Citation.] That a particular rate may not cover the cost of a particular good or service does not work confiscation in and of itself. [Citation.] In other words, confiscation is judged with an eye toward the regulated firm as an enterprise.

"The answer to the question whether the rate set is just and reasonable depends on a balancing of the interests of the producers of the goods or services under regulation and the interests of the consumers of such goods or services.

"[¶] . . . [¶]

"[T]he consumer has a legitimate interest in freedom from exploitation.

"[F]or its part, the producer 'has a legitimate concern with [its own] financial integrity. . . . From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. [Citation.] By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' [Citation.]

26

"It must be emphasized that the foregoing describes an interest that the producer may pursue and not a right that it can demand.  That interest is 'only one of the variables in the constitutional calculus of reasonableness.'  [Citation.]  'A regulated [firm] has no constitutional right to a profit . . . .'  [Citations.]  Indeed, such a firm has no constitutional right even against a loss.  [Citation.]

"In balancing the relevant producer and consumer interests for a just and reasonable rate, one is concerned with a 'broad zone of reasonableness' and not with any particular point therein.  [Citation.]  So long as the rate set is within that zone, 'there can be no constitutional objection . . . .'  [Citation.]

"In attempting to balance producer and consumer interests, one may of course arrive at a rate that disappoints one or even both parties.  But a striking of the balance to the producer's detriment does not necessarily work confiscation.  Indeed, it can *threaten* confiscation only when it prevents the producer from 'operating successfully' -- as that phrase is impliedly defined in prior opinions and is expressly used in this, viz., operating successfully *during the period of the rate and subject to then-existing market conditions*.

"[¶] . . . [¶]

"Thus, a producer *may* complain of confiscation only if the rate in question does not allow it to operate successfully. . . .  In a word, the inability to operate successfully is a necessary -- but not a sufficient -- condition of confiscation.

"In *Jersey Central*, the United States Court of Appeals for the District of Columbia Circuit, sitting in bank, and speaking through Judge Bork, explained: '. . . [T]he only circumstances under which there is a possibility of a taking of investors' property by virtue of rate regulation is when a [regulated firm] is in the sort of financial difficulty described [as] 'deep financial hardship.'  [Citation.]  The firm may experience such hardship when it does not earn enough revenue for both 'operating expenses' and 'the capital costs of the business,' including 'service on the debt and dividends on the stock,' of a magnitude that would allow a 'return to the equity owner' that is

27

'commensurate with returns on investments in other enterprises having corresponding risks' and 'sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' [Citation.] 'But absent [that] sort of deep financial hardship . . . there is no taking . . . .' [Citation.] This follows from the fact that . . . a regulated firm may claim that a rate is confiscatory only if the rate does not allow it to operate successfully. In such circumstances, the firm is not inaptly characterized as experiencing 'deep financial hardship' as a result of the rate.

"[¶] . . . [¶]

"[T]he law under the due process clause of article I, sections 7 and 15 of the California Constitution and the takings clause of article I, section 19 of that same instrument is in accord with the foregoing principles." (*20th Century*, *supra*, 8 Cal.4th at pp. 292-297, fns. omitted.)

In the course of the foregoing discussion, our Supreme Court also included the following footnote: "In *Guaranty Nat. Ins. Co. v. Gates* (9th Cir. 1990) 916 F.2d 508, 515, there is language that may be read to erroneously state that the producer is constitutionally 'guarantee[d]' a ' "fair and reasonable return [,]" ' and that such a return must necessarily be above the 'break even' level. We will not indulge in such a reading." (*20th Century*, *supra*, 8 Cal.4th at p. 294, fn. 18.)

Turning back to the superior court's ruling, the California Supreme Court explained that the ratemaking formula could not be "deemed confiscatory" because the terms of the formula "do not themselves impose a rate . . . that inflicts on insurers '. . . deep financial hardship . . . .' " (*20th Century*, *supra*, 8 Cal.4th at p. 297.) The court then continued as follows:

"This point is crucial. It deserves special emphasis. The superior court committed fundamental error. At least in the general case, such as this, confiscation does indeed require 'deep financial hardship' within the meaning of *Jersey Central*, i.e., the inability of the regulated firm to operate successfully -- meaning, again, the inability of the

28

regulated firm to operate successfully *during the period of the rate and subject to then-existing market conditions*. [Citation.] Hence, it does *not* arise, as the superior court erroneously believed, whenever a rate simply does not 'produce[] a profit which an investor could reasonably expect to earn in other businesses with comparable investment risks and which is sufficient to attract capital.' Profit of that magnitude is, of course, an interest that the producer may pursue. But it is not a right that it can demand. It is 'only one of the variables in the constitutional calculus of reasonableness.' [Citation.] . . . [T]he 'notion that [a regulator] is required to maintain, or even allowed to maintain to the exclusion of other considerations, the profit margin of any particular [regulated firm] is incompatible . . . with a basic precept of rate regulation. "The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid." ' " (*20th Century*, *supra*, 8 Cal.4th at pp. 297-298.)

With the foregoing understanding of the constitutional concept of confiscation, we turn back to the arguments presented by Mercury and the Trades, and we find no merit in them. Mercury contends the commissioner and the superior court erred in rejecting the "fair rate of return" standard of confiscation in favor of the "deep financial hardship" standard, but we find no such error. The Supreme Court explained in no uncertain terms in *20th Century* that "the inability to operate successfully is a necessary . . . condition of confiscation" (*20th Century*, *supra*, 8 Cal.4th at p. 296), and the court soundly rejected the contrary assertion that a regulated business is "constitutionally 'guarantee[d]' a ' "fair and reasonable return" ' " (*id.* at p. 294, fn. 18). The "fair rate of return" standard espoused by Mercury contravenes both of these principles.

The Trades' arguments fare no better. The Trades first argue that in *Lingle v. Chevron* (2005) 544 U.S. 528 [161 L.Ed.2d 876], the United States Supreme Court reached the conclusion that "a Takings analysis is not a vehicle for invalidating a price control statute or regulation, or agency order. It is a basis for compensation by

29

government when government has legitimately exercised its power to 'take', subject to the duty to compensate.  It is the Due Process analysis -- which is 'logically prior to and distinct' from the Takings analysis -- that determines whether a specific price regulation may be invalid as transgressing constitutional limits on the state's power to regulate price."  However, if by this argument the Trades mean to suggest that the "deep financial hardship" test for confiscation under takings clause that was articulated and explained in *20th Century* is no longer valid, we cannot agree.  The question in *Lingle* was whether language originating in *Agins v. City of Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106], declaring that "government regulation of private property 'effects a taking if [such regulation] does not substantially advance legitimate state interests,' " was "an appropriate test for determining whether a regulation effects a Fifth Amendment taking." (*Lingle*, at pp. 531, 532 [161 L.Ed.2d at pp. 883, 884].)  The Supreme Court concluded it was not.  (*Id.* at p. 532 [161 L.Ed.2d at p. 884].)  *Lingle* was not a price control case at all, and the court therein never considered or addressed the "deep financial hardship" standard for determining whether a price control is constitutionally confiscatory. Accordingly, *Lingle* is of no assistance to the Trades here.

The Trades next argue that the superior court "placed undue reliance on *20th Century*" because that case:  "(1) did not involve a separate due process analysis; (2) can and should be read consistently with *Calfarm*; and (3) is based on unique facts conclusively distinguishing the current context."  None of these arguments is persuasive. The first argument depends on the Trades' assertion that *Lingle* foreclosed any continuing analysis of a price control under the takings clause and instead substituted a separate due process analysis.  We have rejected that argument already; *Lingle* had nothing to do with price controls.

The Trades' second argument -- that "*20th Century* can be harmonized with *Calfarm*" -- is one with which we agree, but not in the way the Trades would like.  We have already shown how our Supreme Court expressly stated that the extended discussion

from *20th Century* set forth above regarding the "deep financial hardship" standard was a "rehears[al of], and elaborat[ion] on, the principles set out in *Calfarm*." (*20th Century*, *supra*, 8 Cal.4th at p. 291.) In *that* manner, *20th Century* and *Calfarm* are harmonious. The Trades' attempt to explain how the *Calfarm* court, "ruling on the state and federal due process clauses, conducted an analysis in line with *Lingle's* pronouncement of the Due Process standard," and how the *20th Century* court can be understood to have "equated 'deep financial hardship,' as used in the opinion, with more traditional notions of confiscation centered on the absence of a fair rate of return," amounts to little more than hocus pocus.

The Trades' third argument -- that "*20th Century's* 'deep financial hardship' test is inextricably tied to its retrospective context," e.g., examination of the regulations applying to the rollback period rather than those applying to the prior approval system that followed the rollback -- does not carry the day either. Nothing in the Supreme Court's extended discussion of the "deep financial hardship" standard suggests that it would apply only to a retrospective price control rather than a prospective price control. Again, the Trades' argument is smoke and mirrors -- nothing more.

For the foregoing reasons, we find no error in the application by the commissioner and the superior court of the "deep financial hardship" standard to determine whether a price control is constitutionally confiscatory.

B

*The Relevant Enterprise*

Mercury next contends that "[h]aving adopted a constitutionally deficient 'financial distress' test, the Commissioner and Superior Court compounded that error by applying that test to . . . Mercury as a whole, including unregulated enterprises and activities." In Mercury's view, "the 'enterprise' subject to the regulated rate" should have been "Mercury's homeowners' line." The problem with this argument is that it is inextricably intertwined with the argument we have rejected already -- that the

31

commissioner should have used a "fair rate of return" standard for determining confiscation. Mercury itself admits that the standard the commissioner used "dictated the use of data related to Mercury as a whole rather than to Mercury's homeowners' line," while use of a "fair rate of return" standard would have easily allowed the commissioner "to calculate the rate of return yielded by the homeowners' premium as determined under the formula." Because we have determined that the commissioner used the correct, "deep financial hardship" standard, and correctly eschewed the "fair rate of return" standard proffered by Mercury, it follows that there is no basis for us to further consider Mercury's argument that the commissioner did not consider the correct "enterprise."

The Trades offer a similar argument, contending that "[t]he 'enterprise as a whole' concept is inextricably linked to" the standard the commissioner used, while "the fair rate of return standard inherently belongs to examination of *the regulated investment*." But given that we have determined already that the commissioner used the correct standard, it follows that he used the correct "enterprise" as well, and the Trades' claim to the contrary is without merit.

The Trades also contend that allowing the commissioner to apply the standard of constitutional confiscation to Mercury as a whole necessarily allows him to consider "insurers' revenue generated outside his jurisdiction," which "unconstitutionally extends the powers of a single state." We do not agree. By considering whether the rate formula in California allows an insurer that operates nationwide to avoid "deep financial hardship," the commissioner is not exercising his power outside the bounds of the state, as his determination of the permissible range of rates in California has no bearing on what the insurer is permitted to charge in any other state.

The Trades also contend that allowing the commissioner to apply the standard of constitutional confiscation to Mercury as a whole wrongfully applies the standard "to all lines of insurance even though the prior-approval structure provides for rate regulation by line of insurance." In making this argument, however, the Trades merely returns to its

32

own "fair rate of return" standard, by arguing that "[t]he insurer . . . will be deprived of the property devoted to the regulated line of business if not allowed the opportunity to earn a fair return" and thus, "the only sensible test is one that looks to the regulated property." As we have rejected the Trades' proffered standard already, we have no basis for accepting the "lines of insurance" argument based on that rejected standard.

To the extent either Mercury or the Trades can be understood to offer other reasons why the standard the commissioner applied is "[i]llogical" or "[u]nworkable," we simply say that it is not for us to question the logic or workability of our Supreme Court's decisions in *Calfarm* and *20th Century*. We can only follow them. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

C

*Remaining Arguments*

Mercury contends the commissioner and the superior court erred by applying the standard for constitutional confiscation to "historical financial data that related to a period when the rates were not in effect." Mercury makes no effort to show, however, what data they *should* have applied the standard to, nor any effort to show that application of the standard to such other data would have resulted in a more favorable result for Mercury. Accordingly, we need not consider this argument further.

Mercury and the Trades also both contend that the commissioner and/or the superior court erred in holding that the "re-litigation ban" in section 2646.4, subdivision (c) precluded Mercury from offering evidence showing that application of the rate formula would deny Mercury a fair return.[6] But again, this argument fails at the

---

[6] The regulation in question provides as follows: "Relitigation in a hearing on an individual insurer's rates of a matter already determined either by these regulations or by a generic determination is out of order and shall not be permitted. However, the administrative law judge shall admit evidence he or she finds relevant to the determination of whether the rate is excessive or inadequate (or, in the case of a

33

outset because it depends on their advocacy of a "fair rate of return" standard. As we understand it, the ALJ precluded the evidence Mercury offered on the constitutional variance because Mercury's evidence did not have any tendency to show "deep financial hardship" that would arise from application of the rate formula, but instead went only toward showing that the rate formula would deny Mercury a "fair return." We have already concluded the commissioner (and the ALJ whose proposed decision the commissioner adopted) applied the correct standard. Thus, we perceive no error in the ALJ's use of that standard in justifying the exclusion of the evidence Mercury proffered.

Finally, Mercury asserts that "[b]ased on its erroneous legal rulings, the Superior Court refused to exercise its independent judgment on the evidence establishing that [application of the rate formula] failed to yield a " 'fair return.' " We have already concluded, however, that the superior court's rulings with respect to the applicable standard of constitutional confiscation were not erroneous. Consequently, the further assertion of error Mercury offers is necessarily without merit as well.[7]

---

proceeding under Article 5, relevant to the determination of the minimum nonconfiscatory rate), whether or not such evidence is expressly contemplated by these regulations, provided the evidence is not offered for the purpose of relitigating a matter already determined by these regulations or by a generic determination." (§ 2646.4, subd. (c).)

[7] Mercury has filed a request that we take judicial notice of certain materials, and the Trades have filed three such requests. In addition, the commissioner has requested that we strike certain portions of the Trades' reply brief. Because we find the materials that are the subject of the various requests for judicial notice are not relevant to our decision, we deny those requests. And because we are affirming the trial court's decision and thereby disposing of this appeal favorably to the commissioner, we deny his request to strike as moot.

## DISPOSITION

The judgment is affirmed.  The commissioner and Consumer Watchdog shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

/s/_____
Robie, J.

We concur:

/s/_____
Raye, P. J.

/s/_____
Mauro, J.

35